UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD C. HUTCHINS )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>ZOLL MEDICAL CORPORATION )<br>)<br>Defendant )<br>) | Civil Action 30121-MAP |

### UNITED STATES PATENT NO. 5,913,685
### PLAINTIFF'S CLAIM CONSTRUCTION MEMORANDUM

Donald C. Hutchins ('Hutchins") respectfully submits his Claim Construction Memorandum to Zoll Medical Corporation ("Zoll") and the Court per PRETRIAL SCHEDULING ORDER entered December 16, 2004. With reference to Patent No. 5,913,685, attached herein as Exhibit #1, Hutchins understands that the court will first consider the claims in light of the intrinsic evidence, namely the Patent Claims themselves, the specifications, and the applicable prosecution history, if it is of evidence.

I. **INTRODUCTION**

The claim language is given its ordinary meaning to one of skilled in the art. Thermalloy Inc. vs. Aavid Engineering, Inc., 935 F. Supp. 55, 59 (D. N.H. 1996). Affirmed, 121 F.3d. 691 (Fed. Cir. 1997. In this case the claim language should be given its ordinary meaning as Hutchins as inventor has not used the language differently.

To best understand the Claims of Patent No. 5,913,685 it would be good to start with the 3rd paragraph of the Specification that reads:

> "For background reference is made to Hutchins U.S. Pat. Nos. 4,583,524 and RE34,800 which disclose, in a portable CPR aiding device, the use of synthetic electronic speech and microprocessor logic to help guide rescuers through CPR procedures in emergency conditions by providing audible information with the proper timing and sequencing."     15

Hutchins filed for Patent No. 4,583,524, herein attached as Exhibit #2, on November 21, 1984 and it was issued April 22, 1986. Further claims were incorporated with Reissue Patent No. 34,800 that was issued November 29, 1994 attached herein as Exhibit #3. Attorney Charles Hieken of the patent law firm of Fish & Richardson represented Hutchins over 20 years ago for these applications and also for Patent No. 5,913,685 the subject of this Claim Construction Memorandum. Attorney Hieken's credentials are attached herein as Exhibit #4.

While Hutchins holds many U.S. and foreign patents, he is not a "basement tinker". His lifelong occupation is that of a tool shop owner in which design problems are solved daily. Hutchins' inventions have always been conceived to meet a need or to solve a problem. Over 20 years ago after completing a CPR course Hutchins realized the need for a simple device that would use voice prompts to guide rescuers through CPR procedures. This need resulted in an invention covered by Patent No. 4,583,524.

To understand the Claims of Patent No. 5,913,685, we need to look first at the Specification of Hutchins' earlier Patent No. 4,583,524. In Patent No. 4,583,524 Hutchins explains the need for an inventive device to guide rescuers through CPR procedures. This explanation is a public record called the patent specification that reads as follows:

### CARDIOPULMONARY RESUSCITATION PROMPTING

> "The present invention relates in general to cardiopul-     5

monary resuscitation and more particularly concerns
novel apparatus and techniques for prompting one or
more rescuers to properly follow rescue procedures,
such as prescribed by the American Heart Association
in conjunction with the American Red Cross, with                10
apparatus that is relatively easy to operate by relatively
unskilled personnel to provide major assistance during
emergency conditions requiring CPR efforts by non-
medical personnel.
   These procedures are based on information provided   15
by the Division of Medical Science, National Academy
of Sciences, National Research Council.
   Cardiopulmonary Resuscitation, also known as CPR,
is a combination of artificial respiration and artificial
circulation, which should be started as an emergency           20
procedure when cardiac arrest occurs by those properly
trained to do so.
   To understand the principles and techniques of cardi-
opulmonary resuscitation, it is important to know
some of the concepts involved in this procedure.               25
   The following points are important to remember;
   1. Air that enters the lungs contains about 21 percent
oxygen and only a trace of carbon dioxide. Air that is
exhaled from the lungs contains about 16 percent oxy-
gen and 4 percent carbon dioxide.                              30
   2. The right side of the heart pumps blood to the
lungs where the blood picks up oxygen and releases
carbon dioxide.
   3. The oxygenated blood then returns to the left side
of the heart, from where it is pumped to the tissues of        35
the body.
   4. In the body tissues, the blood releases oxygen and
takes up carbon dioxide, after which it flows back to the
right side of the heart.                                        40
   5. All body tissues require oxygen, but the brain re-
quires more than any other tissues. It is generally esti-
mated that if the brain is totally deprived of oxygenated
blood for a period of four to six minutes, it will probably
suffer irreversible damage.                                    45
   6. The condition that exists when breathing and cir-
culation stop is called clinical death.
   7. The condition that exists when the brain has been
deprived of oxygenated blood for a period of six min-
utes or more and irreversible damage has probably              50
occurred is called biological death.
   Both ventilation and circulation are required to main-
tain life.
   When breathing stops, the circulation and pulse may
Continue for some time, a condition known as respira-          55
tory arrest. In his case, only artificial respiration is
required, since the heat action continues to circulate

3

blood to the brain and the rest of the body. Common
causes of respiratory arrest are drowning, electric
shock, suffocation, strangulation, accidents and drug                60
overdosage.
    When circulation stops, the pulse disappears and
breathing stops at the same time or soon thereafter. This
condition is known as cardiac arrest. When cardiac
arrest occurs, both artificial respiration and artificial            65
circulation are required to oxygenate the blood and
circulate it to the brain. Common causes of cardiac
arrest are heart attack; electric shock; hemorrhage; and,

**2**

as a final phase of drowning, suffocation and other
forms of respiratory arrest.
    There are some situations which require special ac-
tions for the artificial resuscitation; one of these is chok-
ing. It is during eating that obstruction of the airway by            5
foreign bodies most often occurs. In adults, meat is the
most common object that causes obstruction; but, in
children, and in some adults, a variety of other foods
and foreign bodies may lead to a blockage of the airway.
    A number of years ago, the American Red Cross           10
(ARC) and the American Heart Association (AHA)
developed a Statement of Cooperation between the two
organizations. Under this Agreement, AHA assumed
the role of research and ARC developed instruction
programs in CPR to train nonprofessional rescuers.                   15
Under these programs, millions have been trained and
thousands of lives have been saved.
    To be certified as a CPR rescuer. A person is taught a
series of physical procedures that cause artificial breath-
ing and circulation. These procedures, such as chest                 20
thrusts, are called for in prescribed sequences and with
specific timing. The sequence and timing are important
because they are directly related to a standard pulse
beat needed to prevent biological death.
    U.S. authorities have agreed upon a method of CPR.      25
For training purposes, most instructors furnish the *Red
Cross CPR Module*, the standard for CPR training in
the United States.
    CPR procedures differ depending upon the condition
and age of the victim and also the number of trained                 30
CPR rescuers present. For example, in a one rescuer
situation, the *Module* asks for a rate of 80 compressions
per minute for an adult and 100 compressions per min-
ute for a child. With two rescuer CPR, 60 compressions
per minute is required.                                              35
    These cycles are interrupted at specified intervals
when diagnoses of vital signs are required and when a

different breathing pattern is needed. While all these directions burden the rescuer's mind, he must remember such important steps as: "Keep the airway passage open," "Check for pulse," "Seal off the nose," Tilt the head back," and the other steps.  40

The single biggest challenge remaining in CPR training is to find a solution to the problem of skill and knowledge decay. The Red Cross has promoted recertification classes each year after the initial course, and this has been a partial solution to this problem. However, in reality, only a small percentage attend these recertification classes. As a result, millions of people trained in CPR are rusty when it comes to instant recall of the routines, timing, and sequence of actions.  45  50

There are also those who have the knowledge but who panic or go blank under the stress of an emergency. It is one thing to have the knowledge and something quite different to recall and follow correct procedures when a loved one is unconscious, lifeless, or choking.  55

Various methods of prompting have been promoted, yet all established solutions have flaws which limit their success. One idea is a simple wallet size card that those trained in CPR can carry and read. Unfortunately, the small size of the cards limits the number of instructions they can carry and the rescuer must divert his attention from the victim to read the prompts.  60

Audio instruction tapes, while useful in the classroom, are of little or no help in emergencies. Tapes are recorded sequentially and tape recorders lack the search techniques needed to find and produce the  65

3

proper instruction sequence demanded for a particular situation.

Telephone "hot lines" have been used experimentally in some cities. Generally when monies from the funding grants have dried up, the CPR, "hot lines" have closed down.  5

Emergency Medical Technicians have made good use of two-way radio and cable networks. When patched into hospital facilities, both instructions and diagnostic information can be transmitted. Unfortunately, a victim of cardiac arrest has only 4 minutes before brain damage is probable. In most of these cases, professional help arrives too late. The need is for immediate attention from a CPR trained bystander."  10

Having authored a description of the need for his invention, Hutchins then introduced what in patent language became the objects for the invention as specified by the object section of the Specification of original Patent No. 4,583,524:

> It is therefore an object of this invention to provide a portable device to provide prompts to those previously trained in CPR, preferably capable of moving to and with the victim.
> Another object is to prompt with audio sounds or voice to allow the rescuer free use of his hands, eyes, voice, mouth, and body.
> A third object is to be public-utility independent with no reliance on telephone lines, A.C. electric outlets, or radio and cable circuits.
> A fourth object of this invention is to employ conventional technology so that the device is relatively inexpensive to manufacture, maintain, and use. This low cost helps insure that the invention will be just as available and prominent in public buildings as fire extinguishers and smoke detectors.
> A fifth object is to provide an instrument which is simple to understand and easy for one rescuer to operate.
> A sixth object is to offer the user either keypad, menu, or punch-button input to initiate one of several CPR procedures published in the *Red Cross CPR Module*.
> A seventh object of this invention is to give the rescuer accurate timing for each CPR maneuver.
> An eighth object is to give the rescuer the proper count of repetitions in breathing and thrust routines.
> A ninth object of the invention is to offer the rescuer calm, accurate instructions which will build confidence and lend encouragement to counteract the stress of emergencies.
> A tenth object is to provide for easy logic changes should the instructions provided by the *Red Cross CPR Module change* in the future.
> An eleventh object of this invention is to make provision for access ports to allow diagnostic enhancements in the future, such as direct pulse reading devices and output ports for modems.
> A twelfth object is to enable the rescuer to quickly change the CPR prompts should the condition of the

6

victim change or should another rescuer appear on the scene to help.    55

A thirteenth object of this invention is to allow for international availability and use, being capable of supporting different languages.

In addition to its use in the field, the invention may be of special value in the schooling and recertification of rescuers, especially in that while it demonstrates the necessary rescue procedures, it offers perfect timing for the trainee. Instruction varies with regard to accurate timing for most CPR courses.    60    65

These and other objects of the invention are achieved with apparatus which allows electronic microcircuit logic to input audio instructions that can be heard by

**4**

the rescuer. The sound for these instructions is preferably created and broadcast by using an electronic voice synthesizer, speech chip, amplifier, and speaker or any other electronic device which produces sound as prompts that can be understood and executed by a CPR rescuer.    5

The genesis for Hutchins invention as described in Patent Nos. 4,584,524 and Re.34,800 was a simple child's education device manufactured by Texas Instruments, Inc. called *Speak and Spell*. The *Speak and Spell* unit used a 4 bit processor that drove an electronic speech processor to spell the selected words. The 4-bit processor was very limited in logic capacity and could control only simple devices. Once programmed, the program that controlled the 4-bit microprocessor could not be changed after the chip was masked as compared to modern microprocessors that are actually general purpose computers in which the program is easily changed depending on the need.

Hutchins knew that this type 4 bit microprocessor could control his invention when it was reduced to practice (made into a workable device) because all he needed was a processor that could select words and phrases from the speech chip and say them with

7

the correct sequence, timing and repetitions called for by the CPR Standards established by the American Heart Association.

Patent No. 4,584,524 was the foundation for a device called CPR Prompt®. The commercial version of CPR Prompt® received FDA approval as a class II medical device, was manufactured by Texas Instruments, Inc. on the same production lines as Speak & Spell and received national recognition by the Red Cross and American Heart Association on television and in magazines. The American Heart Association recognized that the CPR Prompt® and the that concept of CPR voice prompting was a revolutionary breakthrough in the CPR rescue process and included voice prompting as a recommendation when they published the new CPR Standards in the *Journal of the American Medical Association*.

In 1994 an investment group led by Jon Lindseth contacted Hutchins with a proposal to license Hutchins' Reissue Patent No. Re.34,800 and develop a consumer version of *CPR Prompt*®. Jon Lindseth had previously achieved great success licensing the patents for the *Interplak* toothbrush and *Thermoscan* thermometer which he developed into nationally recognized brands. As an expert on patents, Jon Lindseth did exhaustive due-diligence to prove the strength of Hutchins' patent Claims prior to licensing Hutchins' Patent No. Re.34,800. Lindseth found the Claims strong and no one has ever challenged these Claims or infringed the CPR Prompt® device in the marketplace.

Using Hutchins' expertise, the Lindseth Group developed a consumer version to CPR Prompt® and put together a large company to market CPR training and rescue products. Based on Hutchins' patents, the Lindseth Group became leaders in the CPR

and automatic defibrillator industry and raised over $50 million with offerings to investors.

As time passed, Hutchins realized that his CPR voice prompting invention covered by his Patent No. Re.34,800 had certain limitations: First, many potential customers were reluctant to pay for the cost of CPR Prompt® units for use in the home and workplace; Second, the American Heart Association revised CPR procedures about every five years forcing the manufacturer to completely reprogram and mask the electronic processors; Third, it would cost thousands of dollars to program the CPR Prompt® with languages other than the original English; Fourth, the CPR Prompt® units did not offer visual or written prompts.

It is in Hutchins' nature to muse about problems and inventive solutions much as a composer must muse about sounds and melodies. As part of the License Agreement with Jon Lindseth, Lindseth had first call on the future patent filings by Hutchins' for inventions related to CPR as disclosed in Exhibit #5 attached. In June of 1995 Hutchins sent letters and patent abstracts to Jon Lindseth's patent attorney, Jeanne Longmuir. These abstracts disclose the basis of Hutchins' inventions that resulted in Patent No. 5,913,685 and are attached herein as Exhibit #6. When Jon Lindseth elected not to participate in the patent process with Hutchins, Hutchins submitted the inventions to Attorney Charles Hieken at Fish & Richardson with a request that he review and search for interfering inventions and draw the Claims. Patent No. 5,913,685 was applied for on June 24, 1996 and issued June 22, 1999. The record shows that there were only minor issues to be resolved with Examiner Robert A. Hafer and the prosecution history file ("file wrapper") is attached as Exhibit #13.

## II.  REFERENCES CITED SECTION OF PATENT NO. 5,913,685

The first page of Patent No. 5,913,685 lists 50 References Cited. They include many submitted with the application by Attorney Charles Hieken and others discovered through searches at the patent office. There were no U. S. or foreign documents cited that indicated that Hutchins' Claims were in conflict with those 50 References.

The patent office is distrustful of patent holders attempting to extend the life of patents and demands that applicants prove differentiation in claims from the holder's of active patents. It is significant that Hutchins' Patents 4,583,524 and Re.34,800 were examined in depth by the patent office examiners and that all the Claims of Patent No. 5,913,685 were found distinct and novel when compared to the Claims contained in Hutchins' previously issued patents.

## III. SPECIFICATION SECTION OF PATENT NO. 5,913,685

As previously stated, the starting point in reading the Specification of Patent No. 5,913,685 is the Specification of Patent No. Re.34,800. Patent Re.34,800 teaches the invention of a CPR prompting device based on electronic 4-bit electronic processing technology. Using this as a foundation, the Specification of Patent No. 5,913,685 builds as it states:

> "The invention relates to cardiopulmonary resuscitation
> (CPR) aiding, and, in particular to computer aiding rescue
> personnel conducting CPR on a subject by providing visible
> and intelligible audible information to the rescue personnel         10
> in response to input from the rescue personnel regarding the
> condition of the subject.
>     For background reference is made to Hutchins U.S. Pat.
> Nos. 4,583,524 and RE34,800 which disclose, in a portable
> CPR aiding device, the use of synthetic electronic speech          15
> and microprocessor logic to help guide rescuers through
> CPR procedures in emergency conditions by providing
> audible information with the proper timing and sequencing.
>     For many years, personal computer and/or computer
> work station terminals have been used in schools, work             20

> places and other locations. Such terminals typically include
> a display device with graphics capability, and many have a
> "sound card" for producing a broad range of audio signals.
> Laser disk systems can be coupled to a computer for
> displaying high quality graphic images. Many computers are                25
> also capable of linking with other computers via hard-wire
> or wireless systems. For example, a local area network
> (LAN) may include several personal computers linked to a
> network server via a hard-wire connection, such as, for
> example, an ETHERNET® or token-ring system. Individual          30
> computers can communicate with remote computers or
> networks via telephone links with modem connections."

It is clear that the term "computer system" refers to everything included in the box defined by the broken line of FIG. 1 of Patent 5,913,685 that is entitled "COMPUTER". "Computer system" also refers to the computer program that controls the segments found in the box entitled "COMPUTER". Patent No. 5,913,685 was among the first software based patents issued in the United States that claimed an, "article of manufacture comprising a computer usable media" and "a computer program."

The CPR software computer program directs the operating system of typical general purpose computers to interact with the other hardware elements of the invention. The result is the output of graphics, sound and other communications required to guide rescuers. The Specification goes on to state the objects of the invention to meet those deficiencies that Hutchins found in the 4-bit processor based CPR Prompt®:

> "An important object of the invention is to provide CPR
> computer aiding for providing guidance to rescue personnel
> trained in CPR for resuscitating a victim under emergency         35
> conditions.
>         According to the invention, a computer system, such as
> a multimedia computer terminal, is configured as a CPR
> audio and visual aiding device. The terms "CPR," "CPR
> procedure" and "CPR techniques" as used herein embrace       40
> cardiopulmonary resuscitation, including mouth-to-mouth
> resuscitation and aiding choking victims. The computer
> terminal broadcasts audible and visible signals to allow
> rescuers full use of hands, eyes, voice, mouth and body
> while being guided through a rescue with the proper timing         45
> for each resuscitation step. Rescue personnel can enter into

11

> an input of the computer terminal information signals representative at least of characteristics of a victim relevant to proper performance of CPR techniques. The information signals can indicate the age group of the victim, the number of rescuers present, and a selected CPR procedure. The computer processing unit responds to the information signals to output stored signals representative of proper steps to be taken in resuscitating or aiding the victim. An output, which includes a display, is responsive to the output signals and provides rescue aiding guidance signals, which include visible signals on the display, of the proper steps to be taken by the rescue personnel in resuscitating or aiding the victim. The visible signals can include a pictorial representation, which may be animated, of a rescuer practicing the proper steps on a victim. The output can further include an electroacoustical transducer responsive to the output signals for providing audible intelligible signals representative of the proper steps, and synchronized with the visible signals." 50 55 60

A CD ROM called CPRNET® which is Patent No. 5,913,685 "reduced to practice" is attached herein as Exhibit #12. The CD-ROM can be inserted in the CD drive of most P.C. based personal computers such as Dell, H.P., IBM, etc. After insertion and startup, the reader will see a screen from which he or she can make a selection of "Adult", "Child" or "Baby". From that point on the reader will be guided through CPR procedures just as described in Page 1, paragraphs 30-60 of the Specification.

The program on the CPRNET® CD-ROM can be loaded on a personal computer and used to guide a rescuer through CPR procedures. In the same way, this CPRNET® program can be stored on a server and when called up can interact with any computer, cell-phone, hand-held device or work station that is on the network.

> "According to another aspect of the invention, a peripheral unit, such as, for example, a multimedia computer terminal, can be networked with other peripheral units, each 65

2

> having an input for entering the information signals and an output that includes a display. In one configuration, a network server responsive to the information signals provides output signals representative of the proper steps to be taken

    in resuscitating or aiding the victim. A communication link    5
communicates the information signals from the peripheral
units to the network server and the output signals from the
server to the peripheral unit sending the corresponding
information signal. In response to the output signals, the
output of the peripheral unit provides guidance signals,    10
including visible guidance on the display, representative of
the proper steps. The visible guidance can be synchronized
with audible intelligible guidance broadcast by an electroa-
coustic transducer.
    According to yet another aspect of the invention, CPR    15
aiding guidance signals are stored in a computer readable
medium coupled to the computer system. The computer
readable medium could be, for example, an integrated circuit
memory, a tape cassette, a hard disk drive, a floppy disk, an
optical disk, a bubble memory, a CD-ROM, and the like."

The screens displayed by the CD-ROM attached herein as Exhibit #12 shows examples of the invention's use of a mouse and keyboard to select the proper CPR instruction required. It also displays those drawings included in Patent No. 5,913,685 as represented in FIG. 3 and FIG. 4A through FIG. 4P. It is significant that Hutchins reduced Patent No. 5,913,685 to practice just as it was described on Page 2, paragraphs 20-45 of the Specification.

             20
    "According to still another feature of the invention, the
output display monitor of the terminal displays a menu, for
example, in the form of a touch keypad, with which the
rescuer could input the information signal via, e.g. a mouse,
a touch-screen, keystrokes on a keyboard, and the like. This    25
menu/keypad can be divided graphically by the age category
of the victim, such as Adult, Baby, and Child. It can be
further divided into rescue procedures, such as One Rescuer
CPR, Two Rescuer CPR, Mouth to Mouth Resuscitation,
Choking Conscious, and Choking Not Conscious proce-    30
dures.
    Another feature of the invention is that it enables the
rescuer to quickly change the CPR aiding prompts by
entering new information signals should the condition of the
victim or number of rescuers change.    35
    According to yet another feature of the invention, the
computer system is configured to permit rescue personnel to
select the language of the intelligible audible signals, thus
allowing for international availability and use, the system
being capable of supporting different languages.    40

> According to another aspect of the invention, the CPR aiding computer system further includes a screen saver computer program. The CPR aiding screen saver keeps pixels active on the screen during idle moments so that CPR computer aiding will be instantly available from the computer terminal by entering a simple command, for example, entering a keystroke.      45

The fact that the invention integrates hardware with computer programs opens up a whole realm of possibilities involving CPR rescues. One such possibility was added during the patent application process by Hutchins in a letter to Attorney Hieken dated December 6, 1995 and attached herein as Exhibit #7. In this letter Hutchins suggested the value of collecting data such as time, date, victim's identity, durations of CPR procedures, etc. during the course of a rescue by means of the Hutchins' invention. Operating systems of computers and networks typically maintain the time of day, date, memory and an elapsed time calculator as part of the system. By integrating a CPR computer program with the native computer system software, Hutchins' invention is able to collect the data for any given rescue automatically and store the data in a data base. This stored data can be relayed instantly for medical assistance feedback to the rescuer. The stored data could also be used at a later date to update hospital, insurance, legal and corporate records. This invention calculates and stores this rescue data in what the Specification calls "a diary of a rescue" as discussed on Page 2, paragraphs 45-55.

> "According to still another aspect of the invention, the CPR aiding computer system is configured to furnish a diary of a rescue. The diary may include information entered by rescue personnel, information recorded automatically by the computer processor or network server, or both.      50
> In still another feature of the invention, the CPR aiding computer system is configured to furnish an accurate run time of the rescue on the computer video display terminal. Upon rescue personnel entering the information signals at the start of a rescue, a window on the computer screen could show the elapsed time. For example, the computer screen could show a stop watch timer or a digital display of the      55

14

elapsed time."

Page 2, paragraphs 60-65 describes the invention as an article of manufacture that includes a computer usable medium that has a computer readable program code embedded therein. It is important to note that software computer programs are manufactured and marketed by companies such as Microsoft and IBM. These programs are patented and are accorded the rights of patent protection under federal law. Hutchins should be accorded the same protection because page 3, paragraphs 0-5 of this Specification describe the program code as an article of manufacture.

> "According to another aspect of the invention, an article of manufacture includes a computer usable medium that has a computer readable program code embodied therein for providing guidance signals to rescue personnel trained in CPR under emergency conditions for aiding a victim. The computer readable program code in the article of manufacture includes computer readable program code for causing a 60

65

3

computer to display visible signals representative of proper steps to be taken by the rescue personnel in resuscitating the victim in response to an information signal input by the rescue personnel. The information signal is representative at least of characteristics of the victim relevant to proper performance of CPR techniques."

5

Another aspect of the invention is described on page 3, paragraphs 10-20, as the Specification discloses a computer program.

> "According to yet another aspect of the invention, a computer program provides guidance signals to rescue personnel trained in CPR under emergency conditions for aiding a victim requiring CPR techniques. The computer program is stored on a media readable by a general purpose computer, and configures the computer upon being read and executed by the computer to perform functions that include allowing the rescue personnel to input an information signal representative at least of characteristics of the victim relevent to proper performance of CPR techniques, and displaying visible signals representative of proper steps to be

10

15

15