UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DONALD C. HUTCHINS,

    Plaintiff,

        v.

ZOLL MEDICAL CORPORATION,

    Defendant.

CASE NO. 04-30121-MAP

**DEFENDANT ZOLL MEDICAL CORPORATION'S
<u>LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

This Statement of Undisputed Material Facts is submitted pursuant to Local Rule 56.1 of the United States District Court for the District of Massachusetts in support of Defendant Zoll Medical Corporation's Motion for Summary Judgment. All record materials referenced herein but not previously filed with the Court are attached to the Declaration of Gary A. Freeman ("Freeman Decl.") or to the Declaration of Jordan M. Singer ("Singer Decl."), filed herewith.

**<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

**<u>Parties</u>**

1.        Plaintiff Donald C. Hutchins is an individual residing in Massachusetts. Complaint, ¶ 1. Hutchins is the named inventor of U.S. Patent No. 5,913,685 (the " '685 patent") and U.S. Patent No. Re. 34,800 (the " '800 patent"). Freeman Decl., Exs. A & B.

2.        Defendant Zoll Medical Corporation is a Delaware Corporation with its principal place of business in Chelmsford, Massachusetts. Complaint, ¶ 2; Zoll's Answer to the Complaint, ¶ 2. Zoll develops, manufactures and sells medical devices, including automatic external defibrillators ("AEDs"). Freeman Decl., ¶ 2.

**The AED Plus**

3.      Zoll manufactures an automatic external defibrillator called the AED Plus. Freeman Decl., ¶ 4. The AED Plus is a portable device that guides a rescuer through a resuscitation sequence that may include defibrillation and/or cardiopulmonary resuscitation (CPR). *Id*. The defibrillator monitors the electrocardiographic rhythm of a victim's heart through specially designed chest pads, analyzes that rhythm, and determines whether the rhythm is shockable or non-shockable. *Id*. If the victim's heart has a shockable rhythm, the AED Plus charges the defibrillator and audibly instructs the rescuer to press a treatment button to deliver the shock. *Id*. In addition, if the victim requires CPR, the AED Plus incorporates a metronome function that monitors the depth and frequency of chest compressions and provides an audible beep to encourage rescuers to perform compressions at the recommended rate of 100 compressions per minute. *Id*.

4.      The AED Plus uses a factory-programmed microprocessor that runs a fixed rescue sequence as soon as the device has been turned on. Freeman Decl., ¶¶ 5, 8. This sequence, which follows a sequence recommended by the American Heart Association, takes the user through the initial steps of checking the patient's responsiveness, calling 911, and assessing the patient's breathing. *Id*. ¶ 5. It then instructs the user to check the patient's circulation and attach special chest pads. Once the pads are attached to the victim's chest, the AED Plus automatically monitors the patient's heart rhythm. *Id*. If defibrillation is advised, the AED Plus directs the user to press a treatment button on the device to administer a shock. After the treatment has been administered, the device continues to monitor the patient's heart rhythm, and advises the user whether additional defibrillation and/or CPR should be performed. *Id*.

5.      The AED Plus records certain event data associated with a rescue: ECG's, compression frequency and depth, the timing of certain rescue events (e.g., defibrillation shocks), when CPR began and ended, and audio recording. Freeman Decl., ¶ 6. All of this data is written over automatically the next time the AED Plus is used, unless the data is first transferred from the AED Plus to a personal computer or PDA running a special program called RescueNet. *Id*. This transfer of data can only take place once the rescue is complete; it can never occur while the AED Plus is still in use. *Id*.

### Plaintiff's Patent Claims

6.      Hutchins asserts both the '685 patent and the '800 patent against the AED Plus. The '685 patent is entitled "CPR Computer Aiding" and was issued on June 22, 1999. The patent discloses a "general purpose computer system adapted for cardiopulmonary resuscitation (CPR) aiding to provide guidance to rescue personnel trained in CPR for resuscitating a victim under an emergency condition." '685 patent, col. 9, ll. 45-48.

7.      Each claim of the '685 patent requires a "general purpose computer." *E.g.*, '685 patent, col. 9, ln. 45; col. 10, ln. 40; col. 11, ll. 29-30; col. 12, ln. 42; col. 13, ln. 23.

8.      The AED Plus lacks many of the components of a general purpose computer. For example, it runs on a dedicated microprocessor that runs a fixed rescue sequence. Freeman Decl., ¶ 8. The user cannot select another program and load it into the device. *Id*. Nor can the user alter the existing program. The AED Plus's program can only be set and changed by the manufacturer. *Id*.

9.      The AED Plus has no hardware or peripherals other than a set of chest pads included with the device. Freeman Decl., ¶¶ 10-11. The chest pads monitor the victim's heart rhythm and administer an electric shock to the heart in the event defibrillation is needed. *Id*.

¶¶ 4, 10-11. The chest pads also monitor the depth and frequency of chest compressions if CPR is necessary. *Id*. ¶¶ 10-11.

10. The AED Plus does not have input devices found on a personal computer, such as a keyboard or keypad, mouse, touch screen, screen pointer, or voice recognition device. Freeman Decl., ¶ 10. Nor does the AED Plus have an external monitor. *Id*., ¶ 8.

11. The AED Plus does not have external disk drives or hard drives. Freeman Decl., ¶ 8. It does not have any memory other than the extremely limited memory included in its microprocessor system. *Id*.

12. Each claim of the '685 patent also requires an "interactive display input." *E.g.*, '685 patent, col. 9, ll. 51-52; col. 10, ln. 49; col. 11, ln. 45; col. 12, ll. 49-50; col. 13, ll. 30-31. The interactive display input is "adapted for selecting from image or text viewed on the display that is representative at least of characteristics of said victim relevant to proper performance of CPR techniques." *Id*., col. 9, ll. 52-57.

13. The AED Plus does not display characteristics of the victim relevant to proper performance of CPR techniques. Freeman Decl., ¶ 9. Nor does it display image or text from which the user may select. *Id*.

14. The instructions that the AED Plus gives to the user are based solely on the fixed rescue sequence programmed into its microprocessor and the information it receives from the chest pads during rescue (which is limited to the patient's heart rhythm and the depth and frequency of chest compressions during CPR). Freeman Decl., ¶ 11. The AED Plus does not require any specific information on the patient, such as age, gender, or whether the victim is conscious or choking. Nor it is possible to enter that information into the AED Plus. Freeman Decl., ¶ 9.

4

15. The '800 patent is entitled "Cardiopulmonary Resuscitation Prompting" and was issued on November 29, 1994. The patent discloses a CPR prompting apparatus "for providing audible verbal guidance to rescue personnel trained in CPR under emergency conditions for aiding a victim requiring CPR techniques." '800 patent, col. 7, ll. 64-68.

16. Each claim of the '800 patent requires, among other things, a "keying means for entering information signals" representative at least of characteristics of the victim "relevant to proper performance of CPR techniques." '800 patent, col. 8, ll. 1-5; col. 9, ll. 33-36.

17. The AED Plus does not allow the user to enter information signals relating to any characteristics of the victim. Freeman Decl., ¶ 12. Nor does the AED Plus have any means of keying in such information. *Id*.

### Plaintiff's Copyright Claims

18. United States Copyright No. TXu-210-208 is entitled "Script & Word List" and was registered on September 13, 1985. Freeman Decl., Ex. C. The document is 30 pages long and consists of a series of "scripts," each containing words and phrases in a specific order. Each "script" is different, based on certain characteristics of the victim, and the number of on-site rescue personnel. For example, the work contains a script for CPR for an adult where two rescuers are present, a separate script for a child requiring mouth-to-mouth resuscitation, and so on. *See id*.

19. The AED Plus has a limited number of pre-programmed voice prompts. *See* Freeman Decl., Ex. 13. These prompts are based on, and follow, Basic Life Support and CPR protocol issued by the American Heart Association. *Id*. ¶ 15.

20. CPR was developed in 1960 and was formally endorsed by the American Heart Association in 1963. Singer Decl., Ex. J. The basic protocol for CPR has not changed since 1960. *See id.*

21. Only two of the voice prompts used by the AED Plus are identical to commands found in plaintiff's "Script and Word List" (U.S. Copyright TXu-210-208): "Check breathing" and "Call for help." Only two other commands are even similar: "Stay calm" and "If no pulse, start CPR." *See* Freeman Decl., ¶ 14, Exs. C & D.

22. United States Copyright No. TXu-213-859 is entitled "LC5800 series cross assembler" and was registered on October 8, 1985. Singer Decl., Ex. A. The work consists of a printout of a computer program in assembly language, written specifically for the LC5800, a now-discontinued 4-bit microcomputer developed by Sanyo. *See id.*, *see also* Singer Decl., Ex. K.

23. The AED Plus's rescue program is written in the C programming language. The AED Plus has never operated a program written in assembly language for the LC5800 microcomputer. Freeman Decl., ¶ 16.

**Plaintiff's Communications with Zoll**

24. On April 16, 2003, Hutchins wrote a letter to Zoll's president, Richard Packer. The letter alleged that the "AED Plus carries many of the features found in the Claims of Patent #5,913,685 that was issued to [Hutchins] in 1999." The letter further suggested that the parties enter into a license agreement and stated that "If Zoll obtains a license, it will eliminate costly litigation." Singer Decl., Ex. B.

25. Richard Packer responded to Hutchins by telephone on May 5, 2003. Packer explained that Zoll did not believe the AED Plus infringed the '685 patent because it operated on

a dedicated microprocessor, rather than a "general purpose computer" as required by the '685 patent. Packer further explained that Zoll was not interested in licensing the '685 patent for any reason at that time. Zoll's Answer to the Complaint, ¶ 16.

26. In August 2003, Zoll decided to learn more about the '685 patent in order to determine whether it might fit with certain future product development needs unrelated to the AED Plus. Freeman Decl., ¶ 17. Zoll's Vice President of Clinical Affairs, Gary Freeman, e-mailed Hutchins and suggested that they meet. *See id.* Freeman's e-mail to Hutchins was motivated solely by his investigations concerning new product development, and was unrelated to plaintiff's previous accusations of infringement by the AED Plus. *Id.*

27. On August 20, 2003, Hutchins and Freeman met at Zoll's headquarters. At that meeting, Freeman reiterated to Hutchins Zoll's position that the AED Plus did not infringe the '685 patent and that Zoll was not interested in licensing the '685 patent for that product. Freeman Decl., ¶ 18. Rather, Freeman expressed Zoll's interest in learning more about the scope of the '685 patent to see if it might have any practical application for future Zoll products. *Id.* In connection with this, Zoll and Hutchins agreed that Zoll's outside patent counsel should be permitted to review the '685 patent and two other of Hutchins's CPR prompting patents, and report his findings to Zoll. *Id.* ¶¶ 20-21.

28. Zoll's patent counsel is G. Roger Lee, Esq. of Fish & Richardson, P.C. Hutchins's patent counsel, Charles Heiken, is also a partner at Fish & Richardson. To avoid a conflict of interest within Fish & Richardson, Zoll and Hutchins agreed to enter into a Consent Agreement whereby Hutchins agreed to allow Lee to review his patents and report his findings to Zoll. *See* Freeman Decl., ¶ 21 & Ex. F.

7

29.  Hutchins executed the Consent Agreement on September 22, 2003.  Zoll executed it shortly thereafter.  Freeman Decl., ¶ 21.  The parties' agreement was set forth in the Consent Agreement as follows:

> HUTCHINS agrees that Zoll may engage G. Roger Lee and others at F&R working under Mr. Lee's direction to undertake an evaluation of the merits of the Hutchins patents, and to give Zoll advice related to the value of the Donald C. Hutchins Patent Number 5,913,685 ("the evaluation and advice").  It is understood that Mr. Lee through this process may also investigate Donald C. Hutchins' Patents Number 4,583,524 and Re 34,800 that are currently licensed to County Line, LLC of Ohio.
>
> ZOLL agrees to communicate with F&R to obtain the evaluation and advice, and to ask F&R to keep the work it does confidential from Charles Heiken; ZOLL also agrees that any charges [] stemming from this investigation shall be paid by ZOLL and no costs will be forwarded to HUTCHINS.
>
> HUTCHINS acknowledges that the evaluation and advice provided to ZOLL may possibly be directly contrary to his interests, and that F&R and G. Roger Lee will not be representing the interests of HUTCHINS in providing the evaluation and advice, but will instead be representing the interests of ZOLL.

Freeman Decl., Ex. F.

30.  Zoll and Hutchins never entered into any agreement other than the Consent Agreement.  Freeman Decl., ¶ 22.

31.  After the Consent Agreement was signed, Roger Lee conducted his review and analysis of the Hutchins patents.  Freeman Decl., ¶ 23.  Zoll subsequently determined that the Hutchins patents did not meet with its product development needs, and decided not to license any of the Hutchins patents.  *Id*. ¶ 24.

Respectfully submitted,

/s/ Jordan M. Singer
John C. Englander (BBO # 542532)
Jordan M. Singer (BBO #651068)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000
Fax: (617) 523-1231

Attorneys for Defendant
Zoll Medical Corporation

Dated: July 18, 2005

LIBA/1560113.1