UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DONALD C. HUTCHINS,

      Plaintiff,

           v.

ZOLL MEDICAL CORPORATION,

      Defendant.

CASE NO. 04-30121-MAP

**DEFENDANT ZOLL MEDICAL CORPORATION'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Zoll Medical Corporation ("Zoll") submits this Memorandum in support of its Motion for Summary Judgment on all counts of the Complaint. Zoll's accused device, the AED Plus, does not infringe plaintiff's patents. Nor does the AED Plus infringe plaintiff's copyrights. Finally, plaintiff's claim for breach of contract must fail because the parties never entered into an agreement to negotiate a license for plaintiff's patents.

**INTRODUCTION**

This lawsuit arises out a fundamental misconception by *pro se* plaintiff Donald Hutchins regarding the scope of his intellectual property rights in the field of cardiopulmonary resuscitation (CPR) voice prompting. While Hutchins seems to believe that his rights encompass much of the field, they are in fact quite narrow. As a result, Hutchins is mistaken in accusing Zoll's AED Plus of infringing certain of his patents and copyrights. Zoll simply does not infringe, and summary judgment is appropriate.

The AED Plus is an automatic external defibrillator designed to analyze the heart rhythm of a victim of sudden cardiac arrest, and, if appropriate, to audibly instruct a rescuer to deliver an

electric shock to the victim's chest in order to reestablish a normal heart rhythm.  The AED Plus also ensures good chest compressions when CPR is performed by monitoring the depth and frequency of chest compressions and providing audible feedback to the rescuer.  While Hutchins has certain patents and copyrights related to CPR voice prompting, these patents and copyrights are quite limited and are fundamentally different from the AED Plus both in purpose and operation.  For example, the principal patent asserted against Zoll is limited to step-by-step prompting of the CPR procedure and requires the use of both a "general purpose computer" and an "interactive display input."  The AED Plus, by contrast, does not provide step-by-step CPR prompting, does not use a general purpose computer, and has no "interactive display input."  The other asserted patent is also limited to step-by-step CPR prompting and requires a "keying means for entering information signals," which the AED Plus plainly lacks.  Hutchins's asserted copyrights – one for computer software and one for a "Script and Word List" – are also limited to step-by-step CPR prompting and have not been used or copied by Zoll.

## FACTS

### A.    The Asserted Intellectual Property

Hutchins asserts two patents against Zoll – United States Patent No. 5,913,685 (the " '685 patent") and United States Patent No. Re. 34,800 (the " '800 patent").  Both patents relate to step-by-step repetition of CPR and other rescue procedures established by the American Heart Association and other health organizations.  *See* '685 patent, col. 1, ll. 13-18; '800 patent, col. 1, ll. 10-19 (copies attached as Exs. A and B, respectively, to the Declaration of Gary A. Freeman ("Freeman Decl.")).  The '685 patent discloses a "general purpose computer system" configured "to provide guidance to rescue personnel previously trained in CPR for resuscitating a victim under an emergency condition."  '685 patent, col. 9, ll. 45-48.  When CPR is required, the user

accesses a CPR prompting program that has been loaded into a general purpose computer, and enters information into the computer through an "interactive display input."  The "interactive display input" is "adapted for selecting from image or text viewed on the display that is representative at least of characteristics of said victim relevant to proper performance of CPR techniques" (*i.e.*, whether the victim is conscious and/or choking, whether mouth-to-mouth resuscitation is required, and whether the victim is an adult, baby or child).  *Id.*, col. 9, ll. 52-57; *see also id.*, col. 7, ll. 51-56; col. 8, ll. 10-14.  Based on the information on the victim entered into the "interactive display input," the general purpose computer displays an icon for the selected procedure and issues audio voice prompts to the user on the proper performance of CPR. *Id.*, col. 8, ll. 14-21.  The general purpose computer's instructions are specific to the characteristics of the victim as entered by the rescuer; for example, the computer's instructions for performing CPR on an adult are different from its instructions for performing CPR on a baby.

The '800 patent also discloses a device for performing step-by-step CPR prompting specific to the characteristics of the victim.  The '800 patent describes a portable electronic CPR prompting system with a "keying means" (*i.e.*, a keyboard) on the front panel which allows the user to enter information signals on the victim's stage of development (adult, baby or child), whether mouth-to-mouth resuscitation will be given, and whether the victim is conscious or unconscious.  *See* '800 patent, col. 8, ll. 1-5; *see also id.*, col. 6, ll. 53-66.  Like the "general purpose computer" in the '685 patent, the device in the '800 patent issues audible instructions to the user based on specific information on the victim entered through the keyboard.

Hutchins also asserts two copyrights against Zoll.  U.S. Copyright No. TXu-213-859 (Exhibit A to the Declaration of Jordan M. Singer ("Singer Decl.")) contains the text of a computer program such as the one that operates the device described the '800 patent.  U.S.

Copyright No. TXu-210-208 (Exhibit D to the Freeman Decl.) covers a "Script and Word List" for audio prompts to be used by a device such as that described in the '800 patent. It contains several different "scripts" or sets of instructions for CPR prompting, based on the specific conditions of the victim.

### B.    The Accused Device

Hutchins alleges that Zoll's AED Plus infringes the patents and copyrights described above. The AED Plus is an automatic external defibrillator ("AED"), about the size of a large lunch box, which enables a user to treat a victim of cardiac arrest during critical moments before paramedics arrive. The AED Plus is operated by a factory-programmed microprocessor that begins a fixed rescue sequence as soon as the device is turned on. *See* Freeman Decl., ¶¶ 5, 8. That sequence takes the user through the process of assessing the victim's responsiveness, breathing, and circulation; attaching special electrode pads to the victim's chest; and, if necessary, administering defibrillation treatment and/or CPR. *Id*. ¶ 5.

The AED Plus deliberately relieves the user of responsibility for making specific treatment decisions. For example, the device analyzes the patient's heart rhythm and itself determines whether defibrillation is advised; if so, it instructs the user to press its treatment button, which administers an electric shock to the patient. *See* Freeman Decl., ¶¶ 4, 5. There is no mechanism on the AED Plus which allows the user to communicate directly with the device, other than an on/off button and the treatment button for administering electric shocks when defibrillation is necessary. *Id*. ¶ 10.

When CPR is administered, the AED Plus monitors the frequency and depth of chest compressions being delivered through a specially designed set of chest pads attached to the victim, and verbally informs the person giving CPR if compression frequency or depth is

inadequate. *Id.* ¶¶ 10-11.  At no time does the AED Plus ask the user to give it information on the characteristics of the victim.  *Id.*, ¶ 12. Indeed, one of the benefits of the AED Plus is that the user need only follow directions and does not need to conduct his own assessment of the victim under the stress of a medical emergency.

The AED Plus automatically records certain event data associated with the rescue.  This data is temporarily stored in the AED Plus's limited memory, and is written over automatically the next time the device is used.  *Id.* ¶ 6.  To preserve this event data[1] long-term (for example, for emergency medical training or further diagnosis), the information must be downloaded to a personal computer running special software called RescueNet.  Once the information has been downloaded from the specialized AED Plus to a personal computer or PDA, it may be transferred to others as a shared file.  The downloading of information from the AED Plus to the personal computer cannot occur until the actual rescue event is over.  *Id.*

### C.     Communications Between the Parties

In April 2003, Hutchins wrote a letter to Zoll's president, Richard Packer, alleging that the AED Plus infringed the '685 patent and proposing that Zoll license that patent for use with its AEDs.  *See* Singer Decl., Ex. B.  Packer responded by telephone on May 5, 2003, explaining to Hutchins that the AED Plus did not infringe the '685 patent because, among other things, it operated on a dedicated microprocessor, not a general purpose computer.[2]

Several months passed.  In August 2003, Zoll began considering whether the '685 patent might fit with certain of its future product development needs unrelated to the AED Plus.

---

[1]  This data consists of ECG's, compression frequency and depth, the timing of certain rescue events (*e.g.*, defibrillation shocks), when CPR began and ended, and audio recording.  *See* Freeman Decl., ¶ 6.

[2]  Hutchins now admits that he has no basis for the allegation in Paragraph 34 of the Complaint that Packer "agreed that Zoll would welcome a licensing agreement with Hutchins" on May 5, 2003.  *See* Plaintiff's Interrogatory Answers at 4, No. 9 (copy attached as Ex. C to Singer Decl.).

Accordingly, Zoll invited Hutchins to meet with Gary Freeman, Zoll's Vice President of Clinical Affairs. At that meeting, Freeman reiterated Zoll's position that the AED Plus did not infringe the '685 patent and that Zoll was not interested in licensing the patent in connection with that product, but did express Zoll's interest in learning more about the scope of the '685 patent. Freeman Decl., ¶ 18. Consistent with this fact-gathering purpose, the parties agreed to let Zoll's patent counsel review the '685 patent and report its findings to Zoll. *Id.* ¶ 20.

Here a potential conflict of interest arose. Zoll's patent counsel, G. Roger Lee, and Hutchins's patent counsel, Charles Heiken, were both partners at the Boston law firm of Fish & Richardson. To address this issue, Hutchins and Zoll entered into a consent agreement which allowed Lee to review the '685 patent (as well as Hutchins's other CPR prompting patents) for Zoll without any discussion or input from Heiken. Freeman Decl., ¶ 21. The purpose of the consent agreement was limited to allowing Roger Lee "to undertake an evaluation of the merits of the Hutchins patents, and to give ZOLL advice related to the value of" the '685 patent. *Id.*, Ex. F. Nowhere in the consent agreement did Zoll promise to license any of the Hutchins patents, or even to negotiate further with Hutchins about a possible license. *See id.* After the consent agreement was signed, Lee conducted his review of the Hutchins patents, and reported his conclusions to Zoll. Zoll subsequently decided not to license any of the Hutchins patents. Freeman Decl., ¶¶ 23-24.

## ARGUMENT

Summary judgment must be granted to Zoll because the undisputed facts show that the AED Plus does not infringe plaintiff's asserted patents or copyrights, and that Zoll did not breach any contract with plaintiff. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## I.     THE AED PLUS DOES NOT INFRINGE PLAINTIFF'S PATENTS.

Hutchins's allegations of patent infringement are completely meritless. Both patents require, in each and every claim, elements that are not found in the AED Plus – a "general purpose computer" and an "interactive display input" for the '685 patent, and a "keying means" for the '800 patent. Furthermore, during prosecution of the '685 patent Hutchins *explicitly distinguished* devices whose relevant design and operation are substantively identical to the AED Plus. The undisputed facts conclusively show that the AED Plus does not infringe either patent.

### A.     The AED Plus Does Not Infringe the '685 Patent.

A patent claim is not literally infringed unless each and every limitation in a properly interpreted claim is present in the accused product. *See Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1579 (Fed. Cir. 1993). Each claim limitation must be exactly met by the accused device. If there is any deviation or if any limitation is missing, there can be no literal infringement as a matter of law. *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 547 (Fed. Cir. 1994). Here, the undisputed evidence shows that there can be no literal infringement because the AED Plus lacks at least two limitations that are present in each and every claim of the '685 patent: (1) a "general purpose computer," and (2) an "interactive display input." *See, e.g.*, '685 patent, claims 1, 13, 21, 31, 39.[3]

---

[3] Although only independent claims are cited above, all the dependent claims necessarily contain these claim elements. *See* '685 patent, claims 1-43.

       1.    <u>The AED Plus Does Not Utilize a General Purpose Computer</u>

The central element of every claim of the '685 patent is the requirement that the CPR aiding program operate on a "general purpose computer."  *See, e.g.*, '685 patent, col. 9, line 45; col. 10, line 40; col. 11, lines 29-30; col. 12, line 42; col. 13, line 23.  Zoll's claim construction, **with which plaintiff agrees**, defines "general purpose computer" as:

> a computer capable of running multiple unrelated programs, which are selected by the user and loaded into the device.  It must feature at least: (1) a central processing unit, (2) one or more input devices that are not specific to any one program, (3) memory, (4) mass storage devices (such as a disk drive) for storing large amounts of data, and (5) one or more output devices.

*See* Zoll's Claim Construction at 1 (citations omitted); Affidavit of Donald C. Hutchins, dated March 25, 2005, ¶ 6 ("March 25 Hutchins Aff.") (copy attached as Ex. D to Singer Decl.).[4]

The AED Plus plainly does not meet this agreed-upon definition.  As described in the Freeman Declaration submitted herewith, the AED Plus is not capable of running multiple unrelated programs; rather, it can run only one program – the factory-programmed rescue guidance sequence.  Freeman Decl., ¶ 8.  Moreover, there is no way for the user to select a program and load it into the AED Plus.  Rather, the AED Plus's program is incorporated during manufacture and cannot be changed or substituted by the user.  *Id*.  In addition, the AED Plus does not have "input devices that are not specific to any one program."  Indeed, as discussed below, to the extent the AED Plus has input devices at all, they are completely specific to its rescue guidance program.  *See id*. ¶ 10.  Finally, the AED Plus does not have a disk drive or

---

[4] Hutchins's agreement with Zoll's claim construction *in toto* is unsurprising, given the clarity with which the '685 patent specification describes the "general purpose computer" at issue.  For example, the specification contemplates "a multi-media personal computer," '685 patent, col. 3, lines 54-55, that features a hard disk, disk drives, a graphic display, speakers, and "one or more input devices, such as for example, a keyboard, a mouse, a touch screen, a screen pointer and, in an exemplary configuration, a voice recognition device."  *Id*., col. 4, lines 1-3. *See also id.*, Fig. 1.

other "mass storage" device. *Id.* ¶ 8.[5]  If the data collected in the AED Plus's limited memory is not affirmatively exported to a separate PDA or personal computer before the AED Plus is next used, the information will be written over. *Id.* ¶ 6.  Having failed to meet almost every part of the definition, the AED Plus cannot be considered a "general purpose computer" as argued by the parties.  For this reason alone, it does not literally infringe any claim of the '685 patent.

         2.      <u>The AED Plus Does Not Have an Interactive Display Input</u>

Each claim of the '685 patent also requires an "interactive display input [] adapted for selecting displayed image or text viewed on the display that is representative at least of characteristics of said victim relevant to proper performance of CPR techniques."  '685 patent, col. 9, lines 52-57; *see also id.*, col. 10, lines 49-52; col. 11, line 31; col. 12, lines 48-52[6]; col. 13, lines 30-35.  Zoll's construction of "interactive display input," with which Hutchins again agrees, is "a device for communicating with a computer which allows a user to respond to options presented by the computer by selecting from a menu displayed on a display screen."  Zoll's Claim Construction at 3.

Again, nothing about the AED Plus even remotely fits this accepted definition of "interactive display input."  First, the AED Plus does not present "options" from which the user may select.  To the contrary, the device gives commands to the user in a predetermined, fixed

---

[5] The AED Plus's only memory is located on its microprocessor system, and consists of a maximum of 16 megabytes of Flash memory and 8 megabytes of RAM.  Freeman Decl., ¶ 8.  By contrast, hard drives for desktop personal computers typically have memory ranging from 20 to 400 gigabytes – thousands of times more memory than the AED Plus's system.  *See* http://www.tigerdirect.com/applications/Category/category_hdd.asp (last visited Jun. 29, 2005) (copy attached as Ex. E to Singer Decl.).

[6] Although Zoll does not specifically argue invalidity of the '685 patent in this motion, Zoll notes that the phrase "said interactive display input" in Claim 31 lacks any antecedent basis, and is therefore indefinite and likely invalid.  *See* Manual of Patent Examining Procedure § 2173.05(e) (8th ed. 2004); *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1355 (Fed. Cir. 1999) (suggesting that lack of antecedent basis would necessarily result in a finding of invalidity under 35 U.S.C. § 112, ¶ 2).  Zoll explicitly reserves the right to challenge the validity of Claim 31, or any other claim of plaintiff's patents, should summary judgment for Zoll on Counts 3-6 not be granted in full.

sequence. Freeman Decl., ¶¶ 5, 9. Because no options are presented in *any* form, they are not presented as a menu displayed in a display screen. *See id*. ¶ 9. Furthermore, even if options were presented, the user could not select from among them because the AED Plus has no input devices with which to enter a selection. *Id*. ¶¶ 10, 12.

Finally, beyond lacking the actual structure of an "interactive display input," the AED Plus also has no mechanism for performing the function of the "interactive display input" in the '685 patent; that is, "selecting displayed image or text representative at least of characteristics of said victim relevant to proper performance of CPR techniques." *E.g*., '685 patent, col. 10, ll. 50-52. As noted in Zoll's Claim Construction, "characteristics of said victim relevant to proper performance of CPR techniques" means three specific traits or qualities of the victim: (1) whether the victim is an adult, baby or child; (2) whether the victim requires mouth-to-mouth resuscitation; and (3) whether a choking victim is conscious or unconscious. *See* Zoll's '685 Claim Construction at 3. The AED Plus does not require – or, for that matter, allow – the user to input such information, and these traits are not relevant to the AED Plus's rescue sequence. As with "general purpose computer," the "interactive display input" is an element of every claim of the '685 patent, and the AED Plus therefore cannot infringe any claim of that patent.[7]

    3.    Hutchins Explicitly Distinguished the Structure
               Used by the AED Plus During Prosecution of His Patent.

The lack of infringement is confirmed by the prosecution history of the '685 patent, because Hutchins in fact *expressly distinguished* the dedicated processor structure used by the

---

[7] Plaintiff's allegations of infringement of Claims 13, 36 and 43 by the AED Plus and RescueNet must similarly fail, as they all require a "general purpose computer" and "interactive display input." '685 patent, col. 10, ll. 40, 48-52; col. 12, ll. 41-42, 48-52, 60-64; col. 13, ll. 23, 30-31, 36-37; col. 14, ll. 16, 34-36. Furthermore, allegations as to Claim 43 independently fail because that claim is dependent on Claim 40, which is not asserted against Zoll. "It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed." *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994) (quoting *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989)).

AED Plus from his claimed invention during patent prosecution.[8]  Indeed, during prosecution

Hutchins took the explicit position that a dedicated device utilizing a microprocessor was

"fundamental[ly] differen[t]" from his professed invention.  Response to Office Action, dated

May 28, 1998, at 15 (copy attached as Ex. F to Singer Decl.).  As originally submitted, plaintiff's

claims made reference only to a "computer system" without qualification, and the claims were

rejected by the patent examiner as being anticipated by and/or obvious in light of U.S. Patent

5,088,037 to Battaglia.  *See* Office Action, dated Jan. 16, 1998 at 2 (copy attached as Ex. G to

Singer Decl.).  The Battaglia patent disclosed a portable rescue administration aid that could be

worn on the rescuer's wrist.  The rescue procedure was stored on a microprocessor, which, as

with the AED Plus, could only be changed or updated by reprogramming the microprocessor.

*See* U.S. Patent No. 5,088,037, col. 3, ll. 13-20 (copy attached as Ex. H to Singer Decl.);

Freeman Decl., ¶ 5.

      In response to the examiner's rejection, Hutchins amended his claims to add, for the first

time, the two key claim elements at issue here.  First, he changed "computer system" to "*general

purpose* computer system" throughout the claims (thereby emphasizing that not just any

"computer," and particularly not a mere microprocessor, was captured by the claims).  Second,

he added language requiring an "interactive display input."  *See* Response to Office Action at 1-

11 (emphasis added).  In addition, Hutchins explicitly contrasted his claimed invention with the

specialized device in the Battaglia patent:

---

[8] A patentee is precluded from obtaining coverage of subject matter if that subject matter has been relinquished during the prosecution of his patent application, either through amendment or by argument.  *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed. Cir. 1999).  Prosecution history estoppel is not limited to amendments intended to narrow the patented invention subject matter, *e.g.*, to avoid prior art, but may also apply to a narrowing amendment made to satisfy any Patent Act requirement.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2002).  "[T]he concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims."  *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 400 (Fed. Cir. 1994).

> The fundamental difference between the Battaglia device and the present invention is that the Battaglia device is a dedicated device, rather than a general purpose computer…. [T]he [Battaglia] device is clearly not in any way a personal computer as that term is generally understood. All of the inputs are special purpose buttons, which could not be used as inputs for a general purpose computer without major modification to the device. Battaglia neither discloses nor suggests an input that includes an interactive display input functioning as recited in the claims.

*Id*. at 15. Like the device in Battaglia, the AED Plus is a dedicated device running on a microprocessor, and is "clearly not in any way a personal computer as that term is generally understood." *Id*. Moreover, the AED Plus is even farther from a general purpose computer than the Battaglia device in that the AED Plus lacks *any* input buttons, and therefore obviously has no inputs which could be used for a general purpose computer without major modifications. Plaintiff specifically excluded a device running on a dedicated microprocessor from his claims during prosecution, and cannot now claim infringement. *Loral Fairchild*, 181 F.3d at 1322.

**B.    The AED Plus Does Not Infringe the '800 Patent.**

Hutchins also claims that the AED Plus infringes the '800 patent. This claim also fails because the AED Plus lacks at least one critical limitation present in every claim of the '800 patent: a "keying means for entering information signals" representative of the number of rescue personnel and the characteristics of the victim. *See* '800 patent, col. 8, ll. 1-5; col. 9, ll. 34-37.

The term "keying means for entering information signals" is properly construed as a means-plus-function claim element, as it uses the phrase "means for" and, more importantly, describes no definite structure. 35 U.S.C. § 112, ¶ 6; *Mas-Hamilton Group v. LaGard, Inc*., 156 F.3d 1206, 1213 (Fed. Cir. 1998). The recited function of the "keying means" in claims 1-8 is "entering information signals representative at least of: (1) characteristics of a victim relevant to proper performance of CPR techniques; and (2) the number of rescue personnel relevant to proper performance of CPR techniques." Zoll's '800 Claim Construction at 2. The recited

function of the "keying means" in claims 9-16 is the same, except it is limited to characteristics of the victim relevant to proper performance of CPR techniques. The recited structure corresponding to this function, as properly determined by looking to the patent's specification, *see Nomos Corp. v. BrainLAB USA, Inc.*, 357 F.3d 1364, 1368 (Fed. Cir. 2004), is a keyboard or keypad. *See* '800 patent, Abstract; col. 6, ll. 23-42; col. 6, ln. 53—col. 7, ln. 6 & Figs. 5-7. The specification describes the preferred form of keyboard as containing buttons for identifying the victim's stage of development (adult, baby or child), buttons to indicate the presence of one or two rescuers, a button indicating that mouth-to-mouth artificial respiration will be given, and buttons to indicate whether a choking victim is conscious or unconscious. *Id.*, col. 6, lines 26-40 & Fig. 5.

The AED Plus plainly fails to meet this claim limitation. Literal infringement of a means-plus-function element requires both that the accused device performs an *identical* function to the one recited in the means-plus-function clause, and that the accused device utilizes the same structure described in the specification, or its equivalent. *Mas-Hamilton*, 156 F.3d at 1211-12; *Schawbel Corp. v. Conair Corp.*, 122 F. Supp.2d 71, 77 (D. Mass. 2000). Neither prong of the test is satisfied here. First, the AED Plus does not perform the function of the "keying means" in the '800 patent. Indeed, the AED Plus does not feature **any means whatsoever** of inputting information signals with respect to the number of rescue personnel or characteristics of the victim, as described in the '800 patent.[9] The AED Plus simply does not

---

[9] Properly construed, the phrase "characteristics of said victim … relevant to proper performance of cardiopulmonary resuscitation techniques" means the following specific traits or qualities of the victim: (1) whether the victim is an adult, baby or child; (2) whether the victim requires mouth-to-mouth resuscitation; and (3) whether a choking victim is conscious or unconscious. *See* '800 patent, col. 6, ll. 31-40; col. 6, ln. 56-col. 7, ln. 1 & Fig. 5. The phrase "representative … of … the number of rescue personnel relevant to proper performance of cardiopulmonary resuscitation techniques" means whether one or two rescuers previously and specially trained to perform rescue operations and CPR techniques is available to treat the victim. *See* '800 patent, col. 2, ll. 17-24; col. 3, ll. 21-22; col. 6, ll. 35-36.

require that information to operate, and indeed, does not even allow the user to input that information.

Nor does the AED Plus utilize the structure disclosed in the '800 specification – a keyboard or keypad – or its equivalent.  Aside from an on/off switch (which plaintiff does not, and cannot, assert infringes his patent) and a treatment button used exclusively to administer an electric shock for defibrillation (and never used during CPR), the AED Plus has no buttons or keys at all.  Because the AED Plus has no "keying means" as set forth in the '800 patent, it does not infringe any claim of that patent.

## II.    THE AED PLUS DOES NOT INFRINGE PLAINTIFF'S COPYRIGHTS.

Hutchins has identified two copyrighted works that he alleges are infringed by the AED Plus: (1) a software program (Copyright No. TXu-213-859); and (2) a "Script and Word List" (Copyright No. TXu-210-208).  Like the asserted patents, the copyrighted works are fundamentally different from works used in the AED Plus, and are not infringed.[10]

In order to prove copyright infringement, Hutchins must show: (1) ownership of a valid copyright, and (2) illicit copying of the protected work by the alleged infringer.  *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 33 (1st Cir. 2001).  Proof of the second prong – illicit copying – itself requires Hutchins to demonstrate both (a) that Zoll copied his work, and (b) that the copy is "substantially similar" to Hutchins's protected expression.  *Id*.  Because Hutchins cannot establish either element of the second prong – copying or substantial similarity – his copyright claims must be rejected as a matter of law.

---

[10] To the extent Hutchins asserts claims of infringement relating to images and graphic instructions, these claims must fail because Hutchins has no registered copyrights for images or graphics.  A party may not bring a suit for copyright infringement unless and until the allegedly infringed work has been formally registered with the Copyright Office.  *See* 17 U.S.C. § 411(a).  Zoll is unaware of any copyrighted material held by Hutchins that covers images or graphics pertaining to CPR prompting or instruction, and Hutchins has identified none.  *See, e.g.*, Plaintiffs' Interrogatory Answers Nos. 5 & 7.

A.     **Zoll Did Not Copy Hutchins's Works.**

A copyright cannot be infringed unless the protected work is actually copied.  *See Hunt v. Wyle Labs., Inc.*, 997 F. Supp. 84, 87 (D. Mass. 1997) ("failure to provide even a scintilla of evidence of copying" dooms copyright claim).  Copying must be established by showing: (1) actual copying by defendant; or (2) that defendant had access to the copyrighted work and that the offending work and copyrighted work are so similar that the Court may infer factual copying (what is sometimes termed "probative similarity").  *See Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir. 1995).  Probative similarity exists only if there are "similarities that, in the normal course of events, would not be expected to arise independently in the two works."  *See* 4 *Nimmer on Copyright* §§ 13.01[B] at 13-12 (2004).  Because the accused works in the AED Plus bear *no* essential similarity to Hutchins's copyrighted works, and because what minimal similarities do exist would be fully expected to arise independently, Hutchins cannot meet his burden of showing copying here.

First, with respect to his software copyright, Hutchins has not and cannot come forward with any evidence of copying, actual or otherwise.  He has not even identified what portions of the software were allegedly copied.  *See* Plaintiff's Interrogatory Answers at Nos. 6 & 7.  Because plaintiff cannot meet his initial burden of showing that his software was copied, his claim for infringement of Copyright No. TXu-213-859 must fail as a matter of law.  *See Lotus*, 49 F.3d at 813; *Yankee Candle*, 259 F.3d at 33 n.4.[11]

---

[11] Hutchins can offer no evidence of copying of his software because it is plain from even a cursory comparison of the Hutchins software and the software controlling the AED Plus that the two programs are not probatively similar.  Hutchins's software guides the user step-by-step through the CPR process, while the AED Plus uses high-tech analysis of the patient's heart rhythms to determine whether defibrillation is necessary and/or whether CPR chest compressions are being delivered with the right depth and frequency.  At the level of user interaction, Hutchins's software requires input from the user on specific characteristics of a victim, processes that input, and provides instructions to the user on how to perform CPR based on that input.  By contrast, the AED Plus's software does not seek any input from the user, and provides commands and instructions independent of any user analysis.

Similarly, Hutchins can produce no evidence that Zoll actually copied any portion of his "Script and Word List." *Compare* U.S. Copyright No. TXu-210-208 *with* list of AED Plus voice prompts (copy attached as Ex. C to Freeman Decl.). Nor can copying of that work be inferred based on probative similarity, because an examination of Hutchins's "Script and Word List" and the equivalent list of verbal commands used by the AED Plus reveals that there is *almost no similarity whatsoever* between the two lists. Indeed, of the hundreds of words and phrases listed in plaintiff's work, only *four* are even similar to those used by the AED Plus in any form: "Call for help," "Check breathing," "Remain calm" and "If no pulse, continue." Freeman Decl., ¶ 14. Four similar short phrases out of several hundred in Hutchins's "Script and Word List" do not yield a similar work overall. *See Rokeach v. Avco Embassy Pictures Corp.*, 197 U.S.P.Q. 155, 161 (S.D.N.Y. 1978) (100 similar words in 70,000-word original work was *de minimis*). In any event, these four commands are so fundamental to CPR performance that they would certainly arise independently in any list of words or commands designed to instruct a rescuer in circumstances requiring CPR. *See, e.g.,* "Adult Basic Life Support," 102 *Circulation* (Supp. I) I-22, I-44 to I-45 (2000) (copy attached as Ex. I to Singer Decl.) (basic steps of One Rescuer CPR include contacting emergency medical services, assessing the victim's breathing, and continuing CPR if there are no signs of circulation); *see also* Freeman Decl., Ex. E. Plaintiff therefore cannot establish copying of his "Script and Word List," and accordingly cannot establish copyright infringement. *Lotus*, 49 F.3d at 813.

### B. The AED Plus Voice Prompts Are Not Substantially Similar to the Protectable Elements of Plaintiff's "Script and Word List."

Even if Hutchins could somehow prove copying of his "Script and Word List" – he cannot – the voice prompts used by the AED Plus do not infringe that work for a second reason: the four isolated statements that are even somewhat similar between the two lists do not amount

16

to protected, copyrightable expression.  It is well-established that not every part of a work is necessarily protected by copyright, and only the portion of the work that constitutes copyrightable expression is capable of being infringed.  *Yankee Candle*, 259 F.3d at 33-34; *Matthews v. Freedman*, 157 F.3d 25, 27 (1st Cir. 1998).  The Court must dissect out those portions of the plaintiff's work that are not protected by copyright, and then determine whether what remains is "substantially similar" to the accused work.  *Yankee Candle*, 259 F.3d at 34.

Many of the phrases in plaintiff's "Script and Word List," including all of the allegedly similar phrases, must be dissected out as unprotectable expression under the merger doctrine because they merely express their underlying ideas.  As the First Circuit has explained, "Some ideas admit of only a limited number of expressions.  When there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression."  *Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc*., 843 F.2d 600, 606 (1st Cir. 1988).

*PortionPac Chem. Corp. v. Sanitech Sys., Inc.*, 217 F. Supp.2d 1238 (M.D. Fla. 2002), is illustrative of how the merger doctrine prevents monopolization of underlying ideas in simple instructions.  In that case, the plaintiff alleged copyright infringement for a chart consisting of five dishwashing instructions – "scrape," "wash," "rinse," "sanitize" and "let stand."  *Id*. at 1247.  The Court held that these instructions merged with the ideas they conveyed and were not protectable expression, noting that it was "at a loss in trying to invent any other instructions, words, or phrases to instruct an observer in washing a pot, or a pan, or any dish."  *Id*.  The Court therefore found no copyright infringement.

As was the case in *PortionPac*, the instructions set forth in Hutchins's "Script and Word List" – including the only phrases that bear any similarity to those used by the AED Plus –

simply express their underlying ideas in the plainest possible terms.  Indeed, it is difficult to imagine how else one could reasonably express the ideas underlying the phrases "Call for help," "Check breathing," "Remain calm" and "If no pulse, continue."[12]  These phrases are therefore properly deemed non-protectable under the merger doctrine.  *Matthews*, 157 F.3d at 28.

Once non-protectable elements of the "Script and Word List" (including those barred by merger) have been identified and dissected out of the work as a whole, it is clear that there is no "substantial similarity" between the AED Plus command list and what remains of the "Script and Word List."  The test for substantial similarity "is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protected expression by taking material of substance and value."  *Yankee Candle*, 259 F.3d at 33 (quoting *Concrete Mach.*, 843 F.2d at 607).  Given that there are *no* similarities between the parties' works after proper application of the merger doctrine, no reasonable ordinary observer could conclude that the remaining portions of the works are substantially similar.  Hutchins's copyrights are not infringed.  *Matthews*, 157 F.3d at 28.

## III.    ZOLL HAS NOT BREACHED ANY CONTRACT WITH PLAINTIFF.

Finally, Hutchins has no claim against Zoll for breach of contract, either in the form of a "verbal contract to negotiate in good faith" or as a "written contract for Attorney Lee's services to expedite a final license."  Complaint, ¶ 38.  The undisputed evidence shows that no such contracts existed between Hutchins and Zoll, and therefore none could be breached.

The only agreement ever reached between Zoll and Hutchins was a consent agreement signed by the parties in 2003 (the "Consent Agreement"), in which Hutchins consented to

---

[12] Application of the merger doctrine is particularly apt here, where both plaintiff's "Script and Word List" and the AED Plus's commands were designed for use under emergency conditions.  When time is of the essence in a medical emergency, setting forth instructions that are quickly and easily understood is paramount.

18

allowing Zoll's counsel at Fish & Richardson, Roger Lee, to review the Hutchins patents and to advise Zoll. Plaintiff had proposed that Zoll license the '685 patent, and the parties determined that it would be prudent for outside counsel to review plaintiff's patents in order to advise Zoll as to their scope. The Consent Agreement was necessary because Hutchins also used Fish & Richardson as his patent counsel.

The Consent Agreement, however, surely did not require the parties to enter into any form of license for the Hutchins patents. Indeed, even the idea of a possible future agreement was noted in the most tepid, tentative terms possible: the preamble to the Consent Agreement stated that Zoll and Hutchins were "interested in *exploring the possibility* of an agreement." Consent Agreement (copy attached as Ex. F to Freeman Aff.) (emphasis added). The parties further acknowledged that even if Hutchins wanted to, he could not grant a license – or any legal rights or relief – to Zoll for the '800 patent or its parent patent, since both of those patents were then licensed to County Line LLC. *See id.*

**A.     The Parties Never Had a Contract to "Expedite a Final License."**

The language of the Consent Agreement makes clear its limited purpose: Hutchins agreed to allow Zoll's counsel at Fish & Richardson to evaluate his patents, and Zoll agreed to pay for the evaluation and require Fish & Richardson to keep the work confidential from Hutchins's attorney at the same firm. Nowhere in the Consent Agreement did the parties agree that Zoll's counsel shall provide "services to expedite a final license." *See generally* Consent Agreement. Indeed, the very nature of the Consent Agreement demonstrates that the parties could not have contemplated such a result: if Zoll had already agreed to enter into a license, there would have been no reason for Roger Lee to "undertake an evaluation of the merits of the Hutchins patents."

*Id*. There is simply nothing about the Consent Agreement – the only agreement between the parties – that requires a final license or Roger Lee's services in expediting a license.[13]

### B.    The Parties Never Had a Verbal Contract to "Negotiate in Good Faith."

Hutchins also alleges that Zoll breached "its verbal contract to negotiate in good faith with Hutchins," although he has offered no evidence of any verbal contract, has not identified its terms, and is not even able to specify what the purpose or ultimate goal of such alleged negotiations was to be. *See* Plaintiff's Interrogatory Answers at 5, No. 12. Moreover, under Massachusetts law, a verbal agreement to "negotiate in good faith" is simply too indefinite to be binding. It is well-settled that "[a]n agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto." *Hunneman Real Estate Corp. v. Norwood Realty, Inc.*, 54 Mass. App. Ct. 416, 419 (2002) (quoting *Rosenfield v. United States Trust Co.*, 290 Mass. 210, 217 (1935)); *see also Quint v. A.E. Staley Mfg. Co.*, 246 F.3d 11, 15 (1st Cir. 2001) (noting that "no oral contract is formed where material terms are not yet agreed upon, and no agreement is reached until there is a written agreement embodying those material terms."). An agreement to *negotiate* an agreement is perhaps even more attenuated. *Richter v. Bank of Am. Nat. Trust & Sav. Ass'n*, 939 F.2d 1176, 1196 (5th Cir. 1991) (holding that an alleged oral contract to negotiate in good faith was too indefinite and consequently unenforceable).[14] Hutchins has no claim against Zoll for breach of contract.

### CONCLUSION

For the foregoing reasons, Zoll's motion for summary judgment should be granted.

---

[13] In fact, the Consent Agreement explicitly acknowledged Hutchins's understanding that "the evaluation and advice provided to ZOLL [concerning the Hutchins patents] may possibly be directly contrary to his interests, and that F&R and G. Roger Lee will not be representing the interests of HUTCHINS in providing the evaluation and advice, but will instead be representing the interests of ZOLL." Consent Agreement at 2.

Respectfully submitted,


/s/ Jordan M. Singer
John C. Englander (BBO # 542532)
Jordan M. Singer (BBO #651068)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000
Fax: (617) 523-1231

Attorneys for Defendant
Zoll Medical Corporation


Dated: July 18, 2005

LIBA/1408457.3

---

[14] Zoll does not deny that there is an implied covenant of good faith in every contract. *See Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005). However, that duty applies solely to performance of an existing contract. *Id.*