UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DONALD C. HUTCHINS,

    Plaintiff,

        v.

ZOLL MEDICAL CORPORATION,

    Defendant.

CASE NO. 04-30121-MAP

## DECLARATION OF GARY A. FREEMAN

I, Gary A. Freeman, hereby declare and state as follows:

### Background

1.    I am Vice President of Clinical Affairs at Zoll Medical Corporation ("Zoll"). I submit this Declaration in connection with Zoll's Motion for Summary Judgment.

2.    Zoll is a leading designer, manufacturer and marketer of proprietary noninvasive cardiac resuscitation devices, disposable electrodes, mobile electrocardiogram (ECG) systems, and EMS data management solutions related to defibrillation and cardioversion. Among Zoll's products are automatic external defibrillators, or AEDs. An AED is designed to provide an electric shock to a heart experiencing an abnormal rhythm in order to reset the heart rhythm to a normal mode. Proper use of an AED enables a rescuer to treat a victim of sudden cardiac arrest during critical moments before paramedics arrive.

3.    I received my Master's of Science degree in electrical engineering in 1987 and began working at Zoll in 1989. Between 1989 and 2000, I was responsible for the development of several components of Zoll's line of AEDs, including the ECG analysis algorithm. I also developed Zoll's current M Series line of AEDs, performed clinical research, and developed the

depth and rate compression sensor for the AED Plus, the Zoll product at issue in this case. After a brief hiatus at another company, I returned to Zoll in 2003 in my current position. Among my current responsibilities is the management of Zoll's intellectual property.

## The AED Plus

4.   Zoll introduced the AED Plus, one of its most sophisticated AEDs, in 2001. The AED Plus is a portable device, about the size of a large lunchbox, that guides a rescuer through a resuscitation sequence that may include defibrillation and/or cardiopulmonary resuscitation (CPR). The defibrillator monitors the electrocardiographic rhythm of a victim's heart through specially designed chest pads, analyzes that rhythm, and determines whether the rhythm is shockable or non-shockable. If the victim's heart has a shockable rhythm, the AED Plus charges the defibrillator and audibly instructs the rescuer to press a treatment button, which delivers a shock to the victim through the chest pads. In addition, if the victim requires CPR, the AED Plus incorporates a metronome function that monitors the depth and frequency of chest compressions and provides an audible beep to encourage rescuers to perform compressions at the recommended rate of 100 compressions per minute.

5.   When the AED Plus is turned on, it runs a self-test and automatically begins a series of audible instructions that constitute a fixed rescue sequence. This sequence follows the protocol recommended by the American Heart Association and other health care organizations. The sequence is as follows:

   a.   The user is instructed to check the patient's responsiveness.
   b.   The user is instructed to call for help (911 or another emergency service).
   c.   The user is instructed to open the patient's airway and check the patient's breathing, giving the patient two breaths if necessary.
   d.   The user is instructed to check the patient's circulation.
   e.   The user is instructed to attach specially-designed electrode pads to the patient's chest.

2

    f.  The AED Plus begins analyzing the ECG rhythm of the patient's heart as soon as the electrodes are properly attached to the patient's chest. The user is instructed not to touch the patient during this analysis.

    g.  Based on the patient's heart rhythm, the AED Plus determines whether the patient would benefit from defibrillation. If so, the user is instructed to press the AED Plus's "Treatment" button to administer an electric shock to the patient's chest.

    h.  The user is instructed to open the patient's airway, check breathing, and check circulation. If the patient does not have a detectable pulse, the user is instructed to begin CPR.

  6.  The AED Plus automatically records certain data during the rescue. This data consists of a second-by-second record of certain rescue events (including when defibrillation shocks were administered and when CPR was begun and ended), as well as audio recording, electrocardiograms, and the depth and frequency of CPR compressions. The data recorded during a rescue event is temporarily stored in the AED Plus's memory, and is written over (and lost forever) the next time the device is used. The event data may be preserved by exporting it to a personal computer or personal digital assistant (PDA) after the rescue event is over. The user must download the event data from the AED Plus to a personal computer or PDA running special software called RescueNet. From there, the data may be saved or transferred to others as a shared file. The event data cannot be transferred while the AED is in use.

### The AED Plus and Plaintiff's Patent Claims

  7.  I have reviewed the two patents asserted against Zoll – U.S. Patent No. 5,913,685 (the " '685 patent") and U.S. Patent No. Re. 34,800 (the " '800 patent"). Copies of these patents are attached hereto as Exhibits A and B, respectively.

  8.  The AED Plus does not have several of the features described in the claims of the '685 and '800 patents. For example, the AED Plus does not contain or use a "general purpose computer." In fact, the AED Plus:

      a. uses a Hitachi SH-3 microprocessor which runs a single, specialized program: the rescue sequence described in paragraph 5 above. The sequence is programmed into the microprocessor before the AED Plus leaves the factory, and cannot be changed by the user.

      b. does not have a disk drive, CD-ROM, cassette deck, or any other mechanism by which the user can load in an outside program. Therefore, there is no way for the user of the AED Plus to select a different program and load it into the device. Upgrades and repairs to the AED Plus's rescue sequence program must be performed by authorized Zoll personnel, and never by the user of the device.

      c. does not have any mass data storage devices, such as a disk drive or hard drive.

      d. does not have an external monitor.

      e. does not have any significant memory. The AED Plus's only memory is located on its microprocessor system. The microprocessor system has a maximum Flash memory of 16 megabytes, and random access memory (RAM) of 8 megabytes.

9. As another example, the '685 patent claims include an "interactive display input" adapted for selecting from image or text viewed on a display. The image or text "is representative at least of characteristics of [the] victim relevant to proper performance of CPR techniques." The patent describes these "characteristics" as: (1) whether the victim is an adult, baby or child; (2) whether the victim requires mouth-to-mouth resuscitation; and (3) whether a choking victim is conscious or unconscious. The AED Plus does not display any of these "characteristics." Nor does the AED Plus allow the user to select from any image or text options presented on a display. Indeed, at no point in the rescue sequence does the AED Plus present options from which the user may select.

10. The '685 patent specification describes an "output display monitor of the terminal [which] displays a menu, for example, in the form of a touch keypad, with which the rescuer

4

could input the information signal via, e.g., a mouse, a touch-screen, keystrokes on a keyboard, and the like." The AED Plus, however, does not have any form of a keyboard, mouse, touch pad, touch screen, or voice recognition device. Rather, the AED Plus only has an on/off button, a "Treatment" button for administering shocks for defibrillation, and chest pads which, when connected to the victim's chest, provide data on the victim's heart rhythm and the depth and frequency of CPR compressions. All of these devices are specific to the AED Plus's rescue sequence.

11. All the information that the AED Plus requires to guide the rescuer through the resuscitation process is provided by the electrode pads attached to the victim's chest. This information comes in two forms. The first is the victim's heart rhythm, which the AED Plus analyzes to determine whether defibrillation is advised. The second is the depth and frequency of the rescuer's chest compressions when CPR is performed. The AED Plus uses this information solely to advise the user as to whether the compressions being delivered are adequate.

12. Similarly, the AED Plus lacks the elements described in the claims of the '800 patent. For example, each claim of that patent contains a "keying means for entering information signals representative at least of characteristics of said victim relevant to proper performance of cardiopulmonary resuscitation techniques." Like the '685 patent, the '800 patent describes these characteristics as (1) whether the victim is an adult, baby or child, (2) whether mouth-to-mouth artificial respiration will be given, and (3) whether a choking victim is conscious or unconscious. By contrast, at no point during the rescue sequence does the AED Plus require – or even allow – the user to input any information specifically about the victim. The AED Plus does not require or allow the user to input the victim's age or stage of development, whether the victim is

5

conscious or unconscious, or whether mouth-to-mouth resuscitation is necessary. Furthermore, as described in paragraph 10 above, the AED Plus has no keyboard or other means for the user to enter such information.

### The AED Plus and Plaintiff's Copyright Claims

13. The AED Plus has a limited number of pre-programmed voice prompts, which are shown on pages 15-16 of the AED Plus Administrator's Guide (attached hereto as Exhibit C). Most of the voice prompts do not pertain directly to the performance of CPR.

14. I have reviewed the list of AED Plus voice prompts and compared it to the "Script and Word List" contained in U.S. Copyright No. TXu-210-208 (attached hereto as Exhibit D). Based on my review, only two phrases are identical – "Check breathing" and "Call for help." Only two other phrases are similar – "Stay Calm" ("Remain Calm") and "If no pulse, start CPR" ("If no pulse, continue").

15. The AED Plus's voice prompts are based on protocols developed by the American Heart Association and other health care organizations. Copies of textbook entries and quick reminder sheets on the AHA-approved protocol for CPR are attached hereto as Exhibit E. Zoll did not review or consult Copyright No. TXu-210-208 when developing its list of voice prompts for the AED Plus.

16. The AED Plus runs on software developed independently by Zoll, which is written in the C programming language. The AED Plus has never operated a program written in assembly language for the LC5800 microcomputer. Zoll did not review or consult Copyright No. TXu-213-859 when developing the software for the AED Plus.

**Contact with the Plaintiff**

17.     As part of its ordinary course of business, Zoll routinely examines existing technology to determine the demand for new products and the feasibility of developing such products. As part of this process, in August 2003 I contacted Donald Hutchins by e-mail to express interest in learning more about the device covered by the '685 patent. Although Mr. Hutchins had previously contacted Zoll with allegations that the AED Plus infringed the '685 patent, the purpose of my e-mail in August 2003 was related solely to my investigations concerning new product development.

18.     Mr. Hutchins and I met at Zoll's offices on August 20, 2003. At that meeting, I explained to Mr. Hutchins that Zoll's interest in the '685 patent was not related to his previous allegations of infringement against the AED Plus, which Zoll considered to be baseless. Rather, I told Mr. Hutchins that Zoll was simply interested in learning more about what the '685 patent taught. If the patent was a good fit with a future Zoll product, Zoll might be interested in entering into a license.

19.     At the August 20 meeting, Mr. Hutchins demonstrated a piece of computer software that he said practiced the '685 patent. He loaded the software from a CD-ROM onto a personal laptop computer that he had brought with him.

20.     After viewing the software program on Mr. Hutchins's personal computer, I was skeptical that Zoll would have a practical use for the '685 patent. Most of Zoll's products require easy portability, and the '685 patent appeared to require that the user be located near a personal computer. Nevertheless, Mr. Hutchins and I agreed that it would be useful for Zoll's outside patent counsel to review the '685 patent in more detail and inform Zoll on the scope of the patent.

21. Zoll's patent counsel is G. Roger Lee of the Boston law firm of Fish & Richardson, P.C. Mr. Hutchins told me that his patent counsel, Charles Heiken, was also an attorney at Fish & Richardson. Because of a potential conflict of interest, both parties agreed to enter into a consent agreement that would allow Roger Lee to review the '685 patent and related patents. I reminded Mr. Hutchins before we entered into the consent agreement that it was intended solely to allow Roger Lee to conduct a patent analysis, and did not relate to any potential licensing of Hutchins's patents. In fact, I informed Mr. Hutchins that even if he and Zoll eventually did enter into a license agreement, it would in all likelihood be drafted by a different attorney.

22. Hutchins signed the consent agreement on September 22, 2003. I signed the consent agreement on behalf of Zoll shortly thereafter. This was the only agreement that the parties ever reached. A copy of the executed consent agreement is attached hereto as Exhibit F.

23. After the consent agreement was signed, Roger Lee undertook an analysis of the '685 patent, as well as U.S. Patent No. Re. 34,800 and its parent patent.

24. Zoll ultimately determined that it did not have any commercial use for devices disclosed in the Hutchins patents, and did not pursue a license with Mr. Hutchins.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of July, 2005.

Gary A. Freeman

LIBA/1563394.1