12

# EXHIBIT C

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DONALD C. HUTCHINS ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> ZOLL MEDICAL CORPORATION ) <br> ) <br> Defendant ) <br> ) | Civil Action: **04-30121-MAP** |

### PLAINTIFF'S MEMORANDUM OF LAW CONTROVERTING DEFENDANT ZOLL MEDICAL CORPORATION'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

### INTRODUCTION

Plaintiff Donald C. Hutchins, ("Hutchins") disputes many of the statements that the Defendant, Zoll Medical Corporation ("Zoll") characterizes as undisputed material facts. Other statements presented by Zoll are in need of clarification. Hutchins also contends the Court should be aware that the Declarations of Gary A. Freeman ("Freeman") and Jordan M. Singer (Singer") are flawed. Neither Freeman nor Singer are experts in the technical matters discussed in their Declarations. Both have a financial and career stake in the outcome of action and Mr. Freeman has filed for a patent that usurps certain Claims of Hutchins' Patent No. 5,913,685. Further, the Declarations of Freeman and Singer were not subject to cross-examination and should not receive the credence of sworn testimony, as would a sworn affidavit.

Zoll's Claims Construction investigation found Hutchins' Patent No. 5,913,685 to be strong. After investigating the Patent File History, Zoll made no challenges to the Abstract, Figures, Field of Search or Claims. Zoll found no impediments in the Examiner's procedures in granting the Patent.

## AMSWER TO ZOLL'S STATEMENT OF UNDISPUTED FACTS.
### The AED Plus

3. Hutchins agrees that the AED Plus is an automatic defibrillator used for defibrillation and/or cardiopulmonary resuscitation ("CPR") and audibly instructs the rescuer to press a treatment button to deliver the shock. To clarify this statement, the AED Plus also uses audible instructions to instruct the rescuer to press the keys/buttons to activate the CPR rescue functions such as the metronome function. The Court should understand that this metronome function is not a typical stand-alone metronome such as that used by music instructors. The AED Plus metronome is an audible electronic signal created by one of the programs contained in the Hitachi SuperH RISC microprocessor ("SuperH") that controls the AED Plus. This electronic metronome feature is used to guide the rescuer in the proper timing and number of compressions after the rescuer uses keying means to call for the CPR functions.

4. Hutchins disputes Zoll's statement that the AED Plus uses a factory-programmed microprocessor that runs a fixed rescue sequence as soon as the device is turned on. This statement is misleading. The Court should know that factories generally program the SuperH for a wide range of applications such as mobile phones, digital cameras, electronic vapor analyzers, etc. In the case of the AED Plus, the factory would install a multitude of programs with variations based on the features that a customer requires. For example, a customer has a choice to purchase or forego Zoll's *Rescue Net* network software. The AED Plus could not possibly run a "fixed rescue sequence" as claimed in Freeman's Declaration because the rescue pattern varies depending on the needs of a victim. Each of the patient's needs must be met with one or a number of the distinct and separate programs lodged in the SuperH RISC computer of the AED Plus.

5. Hutchins agrees that the AED Plus records certain event data associated with a rescue. Hutchins agrees that the data may be written over the next time the AED Plus is used and transferred to a personal computer running a special program called RescueNet. Hutchins asks the Court to recognize that these features are additional proof that the AED Plus is controlled by a general-purpose computer with the product name Hitachi SuperH RISC microprocessor. The acronym RISC of the SuperH™ RISC engine

2

is defined as "Reduced Instruction Set Computer. The Court should also understand that the "C" Programming language that Zoll uses to program the AED Plus is general-purpose computer programming language. The "C" programming language would not be used to program a simple single-purpose microprocessor such as that claimed by Zoll.

### Plaintiff's Patent Claims

6. Hutchins disputes Zoll's statement the "Hutchins asserts both the '685 patent and the '800 patent against the AED Plus. The Complaint clearly shows that Hutchins does not assert the older '800 patent. The '800 patent teaches the use of a simple 4-bit processor that has no capability to execute such features as networking, graphic output, etc. performed by the general-purpose computer processor described in Hutchins' '685 patent. The Complaint asserts the claims of Hutchins' '685 patent against the AED Plus.

7. Hutchins agrees that many of the claims of the '685 patent requires a "general purpose computer" such as the Hitachi SuperH RISC microprocessor that drives the AED Plus and uses the '800 patent only for reference.

8. Hutchins disputes that the AED Plus lacks many of the components of a general purpose computer. The Hitachi SuperH RISC microprocessor that drives the AED Plus fits the description contained in Zoll's construction and appendix for United States Patent No. 5,913,685 filed March 2, 2005. Zoll's definition states, "the term "general purpose computer" means a computer capable of running multiple unrelated programs, which are selected by the user and loaded into the device. It must feature at least (1) a central processing unit, (2) one or more input devices that are not specific to any one program, (3) memory, (4) mass storage devices for storing large amounts of data and (5) one or more output devices." The SuperH that drives the AED Plus meets the criteria established by Zoll. The versatility of the SuperH allows the user of the AED Plus to input a request to download rescue data and then to output this data to a network. This versatility allows sensors to input the victim's heart rate and to output either defibrillation or CPR prompting signals as required.

9. Hutchins disputes Freeman's claim that the AED Plus has no hardware or peripherals other than a set of chest pads. The AED Plus's uses the LCD peripheral to display shocks, depth of compression, ECG waveform and visual user prompts. The

3

AED Plus uses a peripheral microphone and a peripheral speaker. The AED Plus is configured with an IrDA Port capable of input/output and connection to typical peripherals such as printers, monitors, etc. by means of digital networks.

10. Hutchins disputes Freeman's claim that the AED Plus does not have input devices found on a personal computer. The AED Plus is configured with an IrDA Port capable of input/output and connection to typical peripherals such as printers, monitors, etc. through digital networks.

11. Hutchins disputes Freeman's claim that the AED Plus does not have external disk drives or hard drives. The AED Plus is configured with an IrDA Port capable of input/output and using Zoll's *Rescue Net* network software to store AED Plus rescue data on the largest external disk drives or network server hard drives.

12. Hutchins disputes Zoll's interpretation of Hutchins' understanding of "interactive display input" when he wrote the claims for patent '685. The term display means: type, composition, or printing designed to catch the eye. The term interactive display could be as simple as a light going on and a rescuer reacting to that light by hitting a key to select a procedure as happens with the AED Plus. It could be as sophisticated as a NASA engineer monitoring a series of screens and keying instructions to a Mars Lander. When writing patent claims Hutchins, as most inventors, select the widest interpretation possible. The wording of this claim does not restrict itself to the type of computer monitor found in the home.

13. Hutchins disputes Freeman's claim that the AED Plus does not display characteristics of the victim relevant to proper performance of CPR techniques. The *AED Plus Administrator's Guide* provided by Zoll as part of Discovery states, "Following the results of the ECG analysis, voice prompts tell the rescuer whether a shockable or non-shockable rhythm has been detected . . .When no shock is advised, the AED issues the following series of prompts: OPEN AIRWAY, CHECK BREATHING, CHECK CIRCULATION, IF NO CIRCULATION – START CPR and illuminates the CPR related graphics." This is undeniable proof that the AED Plus does sense, react to and display characteristics of the victim relevant to proper performance of CPR techniques.

14. Hutchins denies Freeman's assertion that the instructions that the AED Plus gives to the user are based solely on the fixed rescue sequence programmed into its

4

microprocessor and that the AED Plus does not require specific information on the patient. The *AED Plus Administrator's Guide* provided by Zoll as part of Discovery states, "Following the results of the ECG analysis, voice prompts tell the rescuer whether a shockable or non-shockable rhythm has been detected . . .When no shock is advised, the AED issues the following series of prompts: OPEN AIRWAY, CHECK BREATHING, CHECK CIRCULATION, IF NO CIRCULATION – START CPR and illuminates the CPR related graphics." This is undeniable proof that the AED Plus does sense such specific information as to whether the victim requires shocking or not and advises the rescuer with voice prompts and directs the rescuer on the correct logic path to follow. Each of these paths represents a separate program that is selectable to the rescuer through keying means.

15. The Complaint clearly shows that Hutchins does not assert the claims of the older '800 patent. The '800 patent teaches the use of a simple 4-bit processor that has no capability to execute such features as networking, graphic output, etc. performed by the general-purpose computer processor described in Hutchins' '685 patent. The Complaint asserts the claims of Hutchins' '685 patent against the AED Plus.

16. The Complaint clearly shows that Hutchins does not assert the claims of the older '800 patent. The '800 patent teaches the use of a simple 4-bit processor that has no capability to execute such features as networking, graphic output, etc. performed by the general-purpose computer processor described in Hutchins' '685 patent. The Complaint asserts the claims of Hutchins' '685 patent against the AED Plus.

17. The Complaint clearly shows that Hutchins does not assert the claims of the older '800 patent. The '800 patent teaches the use of a simple 4-bit processor that has no capability to execute such features as networking, graphic output, etc. performed by the general-purpose computer processor described in Hutchins' '685 patent. The Complaint asserts the claims of Hutchins' '685 patent against the AED Plus.

## **Plaintiff's Copyright Claims**

18. Hutchins agrees that United States Copyright No. TXu-210-208 is entitled "Script & Word List" and was registered on September 13, 1985 and the other assertions contained in paragraph 18.

19. Hutchins agrees that the current model of the AED Plus broadcasts a limited number of pre-programmed voice prompts that are based on the CPR protocol issued by the American Heart Association. Hutchins also asserts that most of these pre-programmed voice prompts contained in the AED Plus devise's computer memory are included in the word list of Copyright No. TXu-210-208. To use these words in a voice prompter that is programmed to aid rescuers performing CPR is to infringe Hutchins' Copyright TXu-210-208.

20. Hutchins agrees that CPR was developed in 1960 and that the basic protocol for CPR has not changed since 1960. Since 1985 Hutchins' Copyright No. TXu-210-208 has protected Hutchins from those who would copy and market for commercial purposes the digital electronic reproduction of these words used in a script he authored to guide rescuers through CPR. This same protection is accorded the authors, composers and poets who copyright their creations through the Library of Congress. Those that plagiarize copyrighted works are forced to desist and are subject to pay damages to the copyright holder

21. .Copyright laws do not define the number of words or phrases that can be stolen from copyrighted works. Hutchins does agree with Freeman's assertion that the AED Plus uses electronic voice prompts that are either identical or similar to lost of CPR related words and phrases that Hutchins copyrighted in 1985.

22. Hutchins denies the Zoll's assumption that Hutchins' Copyright No. TXu-213-859 applies only to an assembly language program written the LC5800. The assembly language used for the LC5800 and the C language used by Zoll to program the AED Plus carry the same logic algorithms structured with voice prompts to guide rescuers in cardiopulmonary resuscitation. For example both the LC5800 and AED Plus required a program to produce 100 compressions per minute and to output this timing to the rescuer. The programmer of the LC5800 and the programmer of the AED Plus produced the identical logic pattern of 100 RPM even though they programmed in different languages just as musicians produce the same tune using different instruments. Copyright laws do not allow a composer to steal a tune from another composer and programmers are not allowed to steal the structure and feel of copyrighted software.

23. Hutchins denies Zoll's assumption that Hutchins' Copyright No. TXu-213-859 applies only to an assembly language program written the LC5800. The assembly language used for the LC5800 and the "C" language used by Zoll to program the AED Plus carry the same logic algorithms structured with voice prompts to guide rescuers in cardiopulmonary resuscitation. For example both the LC5800 and AED Plus required a program to produce 100 compressions per minute and to output this timing as an audible sound to the rescuer. The programmer of the LC5800 and the programmer of the AED Plus produced the identical logic pattern of 100 RPM even though they programmed in different languages just as musicians produce the same tune using different instruments. Copyright laws do not allow a composer to steal a tune from another composer and programmers are not allowed to steal the architecture and feel of copyrighted software.

### Plaintiff's Communications with Zoll

24. Hutchins agrees that he wrote such a letter to Zoll's president to make him aware that the AED Plus infringed Hutchins' intellectual properties. This is a patent holder's method of placing an infringing party on notice of infringement and allows that party to investigate the accusation.

25. Hutchins agrees that Richard Packer responded by telephone. Hutchins agrees that Packer said that Zoll had investigated Hutchins '685 patent while developing the AED Plus and concluded that the AED Plus would not infringe the '685 patent because Zoll used a microprocessor rather than a computer to control the AED Plus. Hutchins replied that many years earlier when ROM, RAM, programming, operating systems and input/output capability were added, microprocessors became "computers on a chip" or microcomputers. (In most foreign languages the translation for microprocessor is microcomputer. For example in French microprocessor is translated as *micro-ordinator*. The French word *ordinator* means computer.) A few weeks later Hutchins sent literature to Mr. Packer that verified the fact that the AED Plus used a computer as a driver. Hutchins denies that Packer explained that Zoll was not interest in licensing the '685 patent either in that telephone conversation or at any other time.

26. Hutchins denies Freeman's assertion that Zoll decided to learn more about the '685 patent for certain future product needs unrelated to the AED Plus. Freeman

7

contacted Hutchins to follow up on Richard Packard's telephone conversation. and to discuss licensing the '685 patent. During this visit there was no discussion of Zoll's new product development.

27.  On August 20, 2003 Freeman told Hutchins that Richard Packer did not know that the modern microprocessor used to drive the AED Plus was actually a microcomputer because Packer was not savvy in electronics. Freeman never suggested to Hutchins that he was interested in learning more about the scope of the '685 patent for future Zoll products. Freeman knew that Hutchins' 800 patent was licensed to County Line Limited and that Zoll had had conversations with Steven Lindseth of County regarding that patent. Hutchins disputes freeman's statement that Zoll's outside counsel was permitted to review the '685 patent for use in future products. It is standard procedure for a company asking to license a patent to seek patent counsel to determine the quality and value of that patent. All the e-mail communications between Freeman and Hutchins relate to the licensing of the '685 patent.

28.  Hutchins disputes Freeman's account of the conflict of interest question within Fish & Richardson. Hieken removed himself from discussions of licensing the '685 patent because of the conflict of interest between Hieken and Attorney Lee within the Fish & Richardson Office. Hutchins agreed to enter into a Consent Agreement to allow Lee to review his patents based on the wording of the Consent Agreement that specified that the purpose of the review was Zoll's desire to license the '685 patent.

29.  Hutchins agrees that he executed the Consent Agreement on September 22, 2003.

30.  Hutchins and a series of e-mails dispute Freeman's interpretation that Hutchins never entered into any agreement other than the Consent Agreement. It is common business practice for parties involved in negotiations for license agreements to follow a verbal contract to the point where a license is signed or the discussions dissolved with notice by one or both parties. After the Consent Agreement was finalized, Freeman sent a number of e-mails to Hutchins committing Zoll to continued discussions within four weeks. Freeman never responded or discontinued the license discussions. Freeman never communicated results of the evaluation by Attorney Lee as he had agreed to do. Hutchins learned through Discovery that during the time of license negotiations with

8

Hutchins that Freeman was preparing his own CPR prompting patent application that copied the concepts, schematics, figures and claims of Hutchinsz' '685 patent. This patent application was subsequently formalized and filed by Attorney Lee.

31. Hutchins denies Freeman's assertion that Zoll determined Hutchins' patents did not meet with its product development needs and decided not to license any of Hutchins' patents. Freeman knew that the '800 patent was already licensed to County Line Limited so that it was not available for licensing. It is evident that Freeman entered negotiations with Hutchins as a fishing expedition designed to steal Hutchins' ideas and patents for himself and Zoll. Both Richard Packer and Freeman underestimated Hutchins' determination to protect his rights to the Claims of the '685 patent.

## CONCLUSION

As set forth above, Plaintiff Donald C. Hutchins disputes most of the statements that the Defendant, Zoll Medical Corporation characterizes as undisputed material facts. Hutchins also contends that the Declarations of Gary A. Freeman and Jordan M. Singer upon which Zoll's "undisputed material facts" are based should not be accepted as either true or accurate and will not stand up to the scrutiny of cross-examination.

Respectfully submitted

The Plaintiff
Donald C. Hutchins, Pro Se

Dated: August 16, 2005

1047 Longmeadow Street
Longmeadow, Massachusetts 01106
(413) 567-0606
(413) 739-4060 (facsimile)

### CERTIFICATE OF SERVICE

I, Donald C. Hutchins, 1047 Longmeadow Street, Longmeadow, Massachusetts 01106, hereby certify that I served a copy of the foregoing on the appropriate party by sending a copy by mail to Jordan M. Singer, Esq., Goodwin Proctor LLP, Exchange Place, Boston, MA 02109.

Dated: 8/16/05

Donald C. Hutchins

9