Hitachi SuperH™ RISC engine

# SH7708 Series

SH7708, SH7708S, SH7708R

Hardware Manual



ADE-602-105H
Rev.9.0
3/7/03
Hitachi, Ltd.

ZOLL 0318

Hitachi SuperH™ RISC engine

# SH-3/SH-3E/SH3-DSP

Programming Manual



ADE-602-096B
Rev.3.0
3/6/03
Hitachi, Ltd

ZOLL 0951

# EXHIBIT B

56000/1, where the '56' comes from... The DSP96000 was one of the first to perform fully IEEE floating point compliant operations.

The processor is not pipelined, but designed for single cycle independent execution within each unit (actually this could be considered a three stage pipeline). With multiple units and the large number of registers, it can perform a floating point multiply, add and subtract while loading two registers, performing a DMA transfer, and four address calculations within a two clock tick processor cycle, at peak speeds.

It's very similar to the Analog Devices ADSP2100 series - the latter has two address units, but replaces the separate data unit with three execution units (ALU, a multiplier, and a barrel shifter).

The DSP56K and 680xx CPUs have been combined in one package (similar idea as the TMS320C8x) in the Motorola 68456.

The DSP56K was part of the ill-fated NeXT system, as well as the lesser known Atari Falcon (still made in low volumes for music buffs).

---

Motorola:
    http://www.mot.com/
Motorola Digital Signal Processors:
    http://www.mot.com/SPS/DSP/products/

---

# Part XII: Hitachi SuperH series, Embedded, small, economical (1992) . . . . . . .

Although the TRON project produced processors competitive in performance (Fujitsu's(?) Gmicro/500 memory-data CPU (1993) was faster and used less power than a Pentium), the idea of a single standard processor never caught on, and newer concepts (such as RISC features) overtook the TRON design. Hitachi itself has supplied a wide variety of microprocessors, from Motorola and Zilog compatible designs to IBM System/360/370/390 compatible mainframes, but has also designed several of its own series of processors.

The Hitachi SH series was meant to replace the 8-bit and 16-bit H8 microcontrollers, a series of PDP-11-like (or National Semiconductor 32032/32016-like) memory-data CPUs with sixteen 16-bit registers (eight in the H8/300), usable as sixteen 8-bit or combined as eight 32-bit registers (for addressing, except H8/300), with many memory-oriented addressing modes. The SH is also designed for the embedded marked, and is similar to the ARM architecture in many ways. It's a 32 bit processor, but with a 16 bit instruction format (different than Thumb, which is a 16 bit encoding of a subset of ARM 32 bit instructions, or the NEC V800 load-store series, which mixes 16 and 32 bit instruction formats), and has sixteen general purpose registers and a load/store architecture (again, like ARM). This results in a very high code density, program sizes similar to the 680x0 and 80x86 CPUs, and about half that of the PowerPC. Because of the small instruction size, there is no load immediate instruction, but a PC-relative addressing mode is supported to load 32 bit values (unlike ARM or PDP-11, the PC is not otherwise visible). The SH also has a Multiply ACcumulate (MAC) instruction, and MACH/L (high/low word) result registers - 42 bit results (32 low, 10 high) in the SH1, 64 bit results (both 32 bit) in the SH2 and later. The SH3 includes an MMU and 2K to 8K of unified cache.

The SH4 (mid-1998) is a superscalar version with extensions for 3-D graphics support. It can issue two instructions at a time to any of four units: integer, floating point, load/store, branch (except for certain non-superscalar instructions, such as modifying control registers). Certain instructions, such as register-register move, can be executed by either the integer or load/store unit, two can be issued at the same time. Each unit has a separate pipeline, five stages for integer and load/store, five or six for floating point, and three for branch.

Hitachi designers chose to add 3-D support to the SH4 instead of parallel integer subword operations like HP MAX, SPARC VIS, or Intel MMX extensions, which mainly enhance rendering performance, because they felt rendering can be handled more efficiently by a graphics coprocessor. 3-D graphics support is added by supporting the vector and matrix operations used for manipulating 3-D points (see Appendix D. This involved adding an extra set of floating point registers, for a total of two sets of sixteen - one set as a 4X4 matrix, the other a set of four 4-element vectors. A mode bit selects which to use as the foreground (register/vector) and background (matrix) banks. Register pair operations can load/store/move two registers (64 bits) at once. An inner product operation computes the inner product multiplication of two vectors (four simultaneous multiplies and one 4-input add), while a transformation instruction computes a matrix-vector product (issued as four consecutive inner product instructions, but using four internal work registers so intermediate results don't need to use data registers).

The SH4 allows operations to complete out of order under compiler control. For example, while a transformation is being executed (4 cycles) another can be stored (2 cycles using double-store instructions), then a third loaded (2 cycles) in preparation for the next transformation, allowing execution to be sustained at 1.4 gigaflops for a 200MHz CPU.

The SH5 is expected to be a 64-bit version. Other enhancements also planned include support for MPEG operations, which are supported in the SPARC VIS instructions. The SH5 adds a set of eight branch registers (like the Intel/HP IA-64), and a status bit which enables pre-loading of the target instructions when an address is placed in a branch register.

The SH is used in many of Hitachi's own products, as well as being a pioneer of wide popularity for a Japanese CPU outside of Japan. It's most prominently featured in the Sega Saturn video game system (which uses two SH2 CPUs) and Dreamcast (SH4) and many Windows CE handheld/pocket computers (SH3 chip set).

---

Hitachi:
   http://www.hitachisemiconductor.com/

---

# Part XIII: Motorola MCore, RISC brother to ColdFire (Early 1998) .

To fill a gap in Motorola's product line, in the low cost/power consumption field which the PowerPC's complexity makes it impractical, the company designed a load/store CPU and core which contains features similar to the ARM, PowerPC, and Hitachi SH, beginning with the M200 (1997). Based on a four stage pipeline, The MCore contains sixteen 32-bit data registers, plus an alternate set for fast interupts (like the ARM, which only has seven in the second set), and a separate carry bit (like the TMS 1000). It also has an ARM-like (and 8x300-like before it) execution unit with a shifter for one operand, a shifter/multiply/divide unit, and an

# EXHIBIT C



About SuperH       Press room       Products       Partners       Support       Japan

# Handheld applications

The SuperH architecture has an impressive legacy of powering handheld devices from PDAs to digital cameras and SuperH are now developing a family of CPU cores specifically targeted at next generation devices in this market. The SH-5 multimedia CPU core delivers both general purpose and DSP performance replacing a RISC and DSP in many existing applications. At a target of 0.3mW/MHz the SH-5 will deliver the best power/performance on the market.

### Next Generation Mobile Phones
These products will have separate baseband and multimedia processors and the SH-5 CPU with its SIMD instruction set supports programmable audio and video codecs such as MPEG4, MP3, H26x and G7xx.





### Digital Cameras
Processing digital and moving images, adding audio and communications capabilities demand a multimedia CPU. SuperH CPUs have demonstrated success in this market and the SH-5 SIMD operations are ideally suited to offering a flexible programmable solution.

## Portable electronic vapor analyzer uses SH-4
The Cyranose 320 is a portable electronic sniffer developed by a Pasadena-based company called Cyrano Sciences, Inc. Its handheld product, based on sensor technology, recognizes certain chemical signatures and is targeting three initial markets: the chemical environmental market, the food processing industry, and the medical establishment. It uses the SH-4 CPU which was selected for performance, high speed, and very low power. The chip incorporates a power management module, allowing designers to turn capabilities on and off at will. It is rated at 1.3 Gigaflops, enabling 1.3 billion operations per second. The SH-4 runs at up to 200 MHz, but power consumption is extremely low. It has sleep modes and deep-sleep modes of operation so it can conserve a maximum amount of energy.

The SH-4 also offers total clock management, allowing the design team to provide for a turbo-charged mode—reaching nearly the full 200 MHz that can handle implementation of complex algorithms in the future. On top of the power features of the device, the design team provided for a lot of memory on board. The handheld offers 1 MB of program flash, so that it can support very large programs. It also offers 512K of RAM so that the sniffer can compute matrix calculations, including I-convectors and matrix conversions. The handheld also has 8 MB of storage, permitting datalogging and storage of vast amounts of information in nonvolatile memory. One scan-across sensor array (a single pattern) is about 100 bytes, thus the device can store a huge number of patterns for different signatures from vapors introduced into the sample chamber.

More information can be found at http://www.chipcenter.com/eexpert/jgoldberg2/tbreunig001.html
and www.cyranosciences.com





More information can be found at:
http://www.xybernaut.com/Solutions/product/poma_product.htm

### Wearable computer uses SH-4

Xybernaut, Inc. have developed the POMA, wearable computer incorporating an SH-4. Poma gives access to e-mail, Internet sites and games and includes an integrated MP3 player. Poma's headmounted display is a one-inch, color, 640 x 480 SVGA viewing screen sitting below the eye and weighing approximately 3 ounces. It provides a viewing area similar to that of a desktop monitor from two feet away.

Poma is a powerful, highly functional computer manufactured by Renesas and is based on the Microsoft Windows CE operating system. It has a 128MHz RISC processor, 32 MB of RAM, 32 MB ROM, a Compact Flash™ slot and one USB port. Poma supports up to 1 GB micro drives, wireless modem cards, wireless LANs and the new CF technology (as it emerges) through its integrated Compact Flash slot. The on-board USB port connects to a customized, hand-held, touch optical mouse pointing device for easy Internet and Windows navigation. Poma is also compatible with wearable keyboards and other pointing and input devices

# EXHIBIT D

# C programming language

From Wikipedia, the free encyclopedia.

The **C programming language** is a standardized imperative computer programming language developed in the early 1970s by Ken Thompson and Dennis Ritchie for use on the UNIX operating system. It has since spread to many other operating systems, and is one of the most widely used programming languages. C is prized for its efficiency, and is the most popular programming language for writing system software, though it is also used for writing applications. It is also commonly used in computer science education, despite not being designed for novices.

*The C Programming Language*, Brian Kernighan and Dennis Ritchie, the original edition that served for many years as an informal specification of the language

## Contents

- 1 Features
  - 1.1 Overview
  - 1.2 "hello, world" example
  - 1.3 Types
  - 1.4 Data storage
  - 1.5 Syntax
- 2 Problems
  - 2.1 Memory allocation
  - 2.2 Pointers
  - 2.3 Arrays
  - 2.4 Variadic functions
  - 2.5 Syntax
  - 2.6 Maintenance problems
  - 2.7 Compiler-external static-checking tools
- 3 History
  - 3.1 Early developments
  - 3.2 K&R C
  - 3.3 ANSI C and ISO C
  - 3.4 C99
- 4 Relation to C++
- 5 See also
- 6 References
- 7 External links
  - 7.1 C
  - 7.2 C99

## Features

### Overview

C is a relatively minimalist programming language that operates close to the hardware, and is more similar to assembly language than most high-level languages are. Indeed, C is sometimes referred to as "portable assembly", reflecting its important difference from low-level languages such as assembly languages: C code can be compiled to run on almost any computer, more than any other language in existence, while any given assembly language runs on at most a few very

3

A. U.S. Patent No. 5,913,685

| | |
|---|---|
| 1. A **general purpose computer system adapted** for cardiopulmonary resuscitation (CPR) aiding to provide guidance to **rescue personnel trained in CPR** for resuscitating a victim under an **emergency condition, comprising:** | The term "**general purpose computer**" means a computer capable of running multiple unrelated programs, which are selected by the user and loaded into the device. It must feature at least: (1) a central processing unit, (2) one or more input devices that are not specific to any one program, (3) memory, (4) mass storage devices (such as a disk drive) for storing large amounts of data, and (5) one or more output devices. *See* Tab A, col. 3, lines 29-34; col. 3, line 54 – col. 4, line 3; *id.* at Fig. 1; Tab B at 15; Tab C at 52. Plaintiff has expressly distinguished a "general purpose computer" from a dedicated device; that is, a device capable of running only a pre-set program. *See* Tab B at 15-16. |
| | The term "**general purpose computer system**" means the combination of hardware and software that allow a general purpose computer to accept input, process and store it, and produce output. *See* Tab C at 270. |
| | The term "**adapted**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "made fit (as for a specific or new use or situation) often by modification." *See* Tab E at 55. |
| | The term "**personnel trained in CPR**" means "one or more persons previously trained in CPR techniques." *See* Tab A, col. 6, lines 50-51. The term "**rescue personnel trained in CPR**" means "one or more persons previously and specially trained to perform rescue operations and CPR techniques." |
| | The term "**emergency condition**" is synonymous with "emergency situation," and means a situation characterized by an |

1

| | |
|---|---|
| | unforeseen combination of circumstances or the resulting state that calls for immediate action. *See* Tab A, col. 6, line 48; Tab E at 407. |
| (a) a computer **terminal**, including: | The term **"comprising"** should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "made up of." *See* Tab E at 270-71. The term **"terminal"** should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "an input-output device consisting of a screen and a keyboard for communicating with a computer." *See* Tab D at 370. |
| (1) an **output** comprising a **display** and an **electroacoustical transducer**; and | The term **"output"** means an "output device" or "a machine that enables you to get information out of a computer," such as a printer or video monitor. *See* Tab C at 201; Tab A, col. 5, lines 37-38.<br><br>The term **"display"** should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was a "display screen" or "the part of the monitor that gives information in visual form." *See* Tab C at 74; Tab E at 365; Tab A, col. 2, line 22.<br><br>The term **"transducer"** should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "a device that is actuated by power from one system and supplies power, usually in another form, to a second system." *See* Tab E at 1252. An **"electroacoustical transducer"** means a transducer that transfers electronic energy into acoustical energy. *See id.* at 401. |
| (2) an **input** comprising an **interactive display input**, | The term **"input"** means an "input device" or "a machine that enables you to put information into a computer for processing." |

2

LIBA/1456122.1

| | |
|---|---|
| | *See* Tab C at 139. *See also* Tab A, col. 1, lines 46-49; col. 5, lines 48-53; Tab B at 13-14, 16.<br><br>The term "**interactive display input**" means "a device for communicating with a computer which allows a user to respond to options presented by the computer by selecting from a menu displayed on a display screen." This construction is based on the ordinary definitions of the component words and plaintiff's use of the term in the specification and prosecution history. *See* Tab C at 74, 139; Tab D at 365. An "interactive system" is "a computer system in which the user communicates with the computer through a keyboard and screen." *See* Tab D at 192-93; *see also* Tab A, col. 7, lines 26-27, 30-32; col. 8, lines 5-6, 10-15. The specification is explicit that the user must communicate with the computer by selecting from options presented on the display. *See* Tab A, col. 2, lines 22-25, col. 7, line 10 – col. 8, line 60; Figs. 4A-4P. |
| **(3) wherein the interactive display input is adapted for selecting from image or text viewed on the display that is representative at least of characteristics of said victim relevant to proper performance of CPR techniques.** | The phrase "**characteristics of said victim relevant to proper performance of CPR techniques**" means the following specific traits or qualities of the victim: (1) whether the victim is an adult, baby, or child; (2) whether the victim requires mouth-to-mouth resuscitation; and (3) whether a choking victim is conscious or unconscious. *See* Tab A, col. 1, lines 39-42, 46-51; col. 2, lines 27-31; col. 6, lines 48-50; col. 7, lines 30-39; col. 8, lines 10-14; *id.*, Figs. 3 & 4A-4P; Tab E at 227.<br><br>The phrase "**wherein the interactive display input is adapted for selecting from image or text viewed on the display that is representative at least of characteristics of said victim relevant to proper performance of CPR techniques**" means that the interactive display input (as defined above) is made fit to display at least two of the following options in image or text form for |

3

| | |
|---|---|
| | selection by the user: (1) whether the victim is an adult, baby, or child, (2) whether the victim requires mouth-to-mouth resuscitation; and (3) whether a choking victim is conscious or unconscious. *See* Tab A, col. 7, line 10 – col. 8, line 14. |
| (4) and **producing information signals corresponding** to the characteristics of said victim represented by said image or text selected with said interactive display input; | The term "**producing**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "giving rise to." *See* Tab E at 938.<br><br>The term "**signal**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "a detectable physical quantity or impulse (as a voltage, current, or magnetic field strength) by which messages of information can be transmitted." *See* Tab E at 1096. As used in the '685 patent, "**information signals**" means "signals that transmit information selected by the user through the interactive display input." *See* Tab A, col. 1, lines 46–49; col. 2, lines 5-9; col. 3, lines 3-4, 14-15, 19-20; col. 5, lines 49-50; col. 7, lines 10-13. |
| | The term "**corresponding**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "having or participating in the same relationship." *See* Tab E at 293. |
| (b) a **processing unit** responsive to the information signals and for providing **output signals** representative of proper steps to be taken in resuscitating said victim; and | The term "**processing unit**" means a processor or CPU, which was understood by one of ordinary skill in the art at the time of the alleged invention to be "the part of the computer where arithmetic and logical operations are performed and instructions are decoded and executed." *See* Tab D at 92; Tab A, col. 1, lines 51-54.<br><br>The term "**output signals**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "signals that transmit the |

4

| | |
|---|---|
| | information that a computer generates as a result of its calculations." *See* Tab D at 267; Tab A, col. 1, lines 51-54; col. 2, lines 5-9; col. 7, lines 53-54. |
| (c) wherein the output, in response to said output signals, provides **guidance signals**, which include **audible speech signals** produced by the electroacoustical transducer, of the proper steps to be taken by said rescue personnel in resuscitating said victim. | The term "**guidance signals**" means signals that transmit information that guides the user. *See* Tab F at 1009; Tab A, col. 7, lines 47-50.<br><br>The term "**audible**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "heard or capable of being heard." *See* Tab E at 115.<br><br>The term "**speech signals**" means signals that transmit information in the form of a human voice. *See* Tab A, col. 7, lines 50, 66-67. |
| 2. The computer system of claim 1, wherein the guidance signals further include **visible signals** on the display. | This claim references a claim previously set forth, Claim 1, and is therefore a dependent claim. As such, it incorporates by reference all the limitations of Claim 1.<br><br>The term "**visible signals**" means "signals that transmit information in a manner that can be seen." *See* Tab E at 1318; Tab A, col. 7, lines 49-50. |
| 3. The computer system of claim 2, wherein said visible signals include a **pictorial representation** of a rescue personnel **practicing** said proper steps upon a victim. | This claim references a claim previously set forth, Claim 2, and is therefore a dependent claim. As such, it incorporates by reference all the limitations of Claim 2.<br><br>The term "**pictorial representation**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "an artistic likeness consisting of pictures." *See* Tab E at 890 & 1000.<br><br>The term "**practicing**" should be given its ordinary meaning as |

5

| Claim Language | Construction |
|---|---|
| 4. The computer system of claim 3, wherein the pictorial representation includes an **animated sequence of images**. | understood by one of ordinary skill in the art at the time of the alleged invention, which was "making use of." *See* Tab F at 1780.<br><br>This claim references a claim previously set forth, Claim 3, and is therefore a dependent claim. As such, it incorporates by reference all the limitations of Claim 3.<br><br>The term "**animated**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "made in the form of an animated cartoon or animation." *See* Tab F at 86.<br><br>The term "**sequence**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "a continuous or connected series." *See* Tab E at 1073.<br><br>The term "**image**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "a vivid or graphic representation or description." *See* Tab E at 600. |
| 6. The computer system of claim 5, wherein the **visible display** further provides **text signals** representative of at least one of said relevant characteristics of said victim and said number of said rescue personnel. | This claim references a claim previously set forth, Claim 5, and is therefore a dependent claim. As such, it incorporates by reference all the limitations of Claim 5.<br><br>Claim 5, which has <u>not</u> been asserted against Zoll, reads "The computer system of claim 3, wherein said information signals are further representative of the number of said rescue personnel relevant to proper performance of CPR techniques." Tab A, col. 10, lines 9-12. Notwithstanding its construction of Claim 6 in light of Claim 5, Zoll does not admit any liability or infringement with respect to Claim 5, and expressly reserves its right to challenge Claim 6 on the ground that Claim 5 has not been asserted. |

| | |
|---|---|
| | The term "**visible display**" means the portion of the display that transmits visible signals. *See* Tab A, col. 1, lines 54-58; col. 2, lines 9-12. |
| 8. The computer system of claim 3, wherein said output signals are further representative of **queries** regarding at least one of said relevant characteristics of said victim and the number of said rescue personnel relevant to proper performance of CPR techniques. | The term "**text signals**" means signals that transmit information that may be viewed on a display as text. *See* Tab A, Figs. 3 & 4A-4P. |
| | This claim references a claim previously set forth, Claim 3, and is therefore a dependent claim. As such, it incorporates by reference all the limitations of Claim 3. |
| | The term "**query**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "question" or "inquiry." *See* Tab E at 965. |
| 13. A **general purpose computer network system** adapted to provide guidance to rescue personnel trained in cardiopulmonary resuscitation for resuscitating victims under emergency conditions, comprising: | The term "**network**" means "a set of computers and/or peripheral units connected together so as to permit two-way communication." *See* Tab C at 186-87; Tab D at 252. The specification is clear that the "network" must feature two-way communication between a network server and peripheral units. *See* Tab A, col. 2, lines 5-9, col. 5, lines 48-55. Furthermore, plaintiff explicitly stated during prosecution that "two way communication capability would be required for computer networks." Tab B at 15. A "**general purpose computer network system**" should therefore be construed as a set of general purpose computers (as that term is defined above) linked together so as to permit two-way communication. *See* Tab A, col. 5, lines 48-55. |
| (a) a **plurality** of **peripheral units**, each including an input for entering information signals representative at least of characteristics of a victim relevant to proper performance of CPR | The term "**plurality**" should be given its ordinary meaning as understood at the time of the alleged invention, which was "a large number or quantity." *See* Tab E at 906. |

7

| Claim Language | Proposed Construction |
|---|---|
| techniques, and an output including a display and an electroacoustical transducer, wherein the input comprises an interactive display input adapted for selecting displayed image or text representative at least of characteristics of said victim relevant to proper performance of CPR techniques, and producing information signals corresponding to the characteristics of said victim represented by said image or text selected with said interactive display input; | The term "**peripheral units**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "devices connected to a computer." *See* Tab D at 283; Tab A, col. 1, lines 65-67. |
| (b) a **network server**, including a **router**, responsive to said information signals for providing output signals representative of proper steps to be taken in resuscitating said victim; and | The term "**network server**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "a computer that stores files and provides them to individual workstations, or clients." *See* Tab C at 255.<br><br>The term "**router**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "a hardware device that connects two or more networks and routes incoming data packets to the appropriate network." *See* Tab D at 327. |
| (c) a **communication link** for **communicating** the information signals from the peripheral units to the network server and the output signals from the network server to the peripheral units, wherein said output provides guidance signals in response to said output signals, said guidance signals including audible speech signals representative of the proper steps to be taken by said rescue personnel in resuscitating said victim. | The term "**communication link**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "a connection between computers, devices, programs or files over which data is transmitted." *See* Tab C at 159; Tab A, col. 5, line 61 – col. 6, line 1.<br><br>The term "**communicating**" with respect to information or output signals means sending signals by means of the communication link. *See* Tab A, col. 5, lines 61-63. |
| 21. An **article of manufacture**, comprising: | The term "**article of manufacture**" means an article produced "from raw materials prepared by giving to these materials new forms, qualities, properties, or combinations whether by hand labor or by machinery." *Diamond v. Chakrabarty*, 447 U.S. 303, |

...

| | |
|---|---|
| (a) a **computer usable medium** adapted for use in a general purpose computer having a processor, a display, an interactive display input, and an electroacoustical transducer, the computer usable medium having **computer readable program code embodied** therein for providing guidance signals to rescue personnel trained in CPR for resuscitation of a victim under an emergency condition, including: | 308 (1980).<br><br>The term "**medium**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "material used for the storage of information," such as magnetic disks, tapes, and optical disks. *See* Tab D at 230. A "**computer usable medium**" is such a medium suitable for use by or with a computer. *See* Tab A, col. 4, line 64 – col. 5, line 2.<br><br>The phrase "having a processor, a display, an interactive display input, and an electroacoustical transducer" refers to the "general purpose computer," not the "computer usable medium."<br><br>The term "**code**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "the instructions in a computer program." *See* Tab C at 47. The term "**computer readable program code**" means code for a computer program that may be read by a computer (as the term "read" is defined in Claim 31 below). *See* Tab A, col. 2, lines 6 – col. 3, line 4.<br><br>The term "**embody**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "cause to become a body or part of a body; INCORPORATE." *See* Tab E at 406. |
| (b) computer readable program code for **causing** the general purpose computer **to display** image or text on the display corresponding at least to characteristics of said victim relevant to proper performance of CPR techniques; | The term "**causing**" should be given its ordinary meaning as understood by one of ordinary skill in the art at the time of the alleged invention, which was "to serve as the cause of." *See* Tab E at 217.<br><br>The term "**to display**" should be given its ordinary meaning as |

9

# EXHIBIT #3