UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DONALD C. HUTCHINS,               )
          PLAINTIFF               )
                                  )
          v.                      )   C.A. No. 04-30121-MAP
                                  )
ZOLL MEDICAL CORPORATION,         )
          DEFENDANT               )


MEMORANDUM REGARDING PARTIES'
MOTIONS FOR SUMMARY JUDGMENT
AND OTHER MISCELLANEOUS RELIEF
(Dkt. Nos. 14, 20, 32, 39, 48, 54, 55, & 57)

May 11, 2006

PONSOR, D.J.

## I. INTRODUCTION

Pro se Plaintiff Donald C. Hutchins contends that
Defendant Zoll Medical Corporation ("Zoll") has: (1)
infringed his patent on an electronic device for
cardiopulmonary resuscitation ("CPR") training; (2)
infringed his copyright on a list of digitized words used in
CPR prompting; (3) infringed his copyright on software
designed to illustrate the timing and quantity of
compressions for those administering CPR; and (4) breached a
contract between the parties.  Defendant denies Plaintiff's
infringement allegations and claims it complied with the
terms of the parties' only agreement, which simply allowed
Defendant's patent counsel -- a partner at the same firm as
Plaintiff's patent counsel -- to review Plaintiff's patents

on Defendant's behalf.

On February 22, 2006, the court heard argument on the following motions: Plaintiff's Motion for Summary Judgment; Defendant's Motion for Summary Judgment; Plaintiff's Motion to Schedule a <u>Markman</u> Hearing; Defendant's Motion to Strike the Affidavit of Robert W. Jeffway; and Plaintiff's Motion to Schedule a Jury Trial.  Shortly thereafter, Plaintiff moved to amend his complaint and to compel discovery, and Defendant filed a motion to strike Plaintiff's post-hearing brief, or in the alternative, offered a response to same.

On March 29, 2006, the court: (1) denied Plaintiff's Motion for Summary Judgment (Dkt. No. 14); (2) allowed Defendant's Motion for Summary Judgment (Dkt. No. 20); (3) denied Plaintiff's Motion to Schedule a <u>Markman</u> Hearing (Dkt. No. 32); (4) denied, as moot, Defendant's Motion to Strike the Jeffway Affidavit (Dkt. No. 39); (5) denied Plaintiff's Motion to Schedule a Jury Trial (Dkt. No. 48); (6) denied Plaintiff's Motion to Amend his Complaint (Dkt. No. 54); (7) denied Plaintiff's Motion to Compel Discovery (Dkt. No. 57), and (8) denied, as moot, Defendant's Motion to Strike Plaintiff's Post-Hearing Brief (Dkt. No. 55).

This memorandum will set forth the reasons supporting these rulings.

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

The court will begin by addressing Defendant's Motion
for Summary Judgment; the facts below therefore appear in
the light most favorable to the Plaintiff.[1]  See Wightman v.
Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir.
1996) (noting courts must "resolve all factual disputes and
any competing, rational inferences in the light most
favorable to the party against whom summary judgment has
entered." (citation omitted)); accord Gart v. Logitech,
Inc., 254 F.3d 1334, 1338-39 (Fed. Cir. 2001) (citation
omitted), cert. denied, 534 U.S. 1114 (2002).[2]

A.   The Patent and Copyrights in Suit.

---

[1] Creating a factual summary has been complicated by
several deficiencies in Plaintiff's pleadings.  For one thing,
Plaintiff's memorandum controverting Defendant's Local Rule
56.1 Statement of Undisputed facts (Dkt. No. 26) lacks any
"page references to affidavits, depositions and other
documentation." Local Rule 56.1.  In addition, Plaintiff's own
statement of undisputed material facts is largely devoid of
such references as well. (See Dkt. No. 15, Pl.'s Mem. Supp.
Mot. Summ. J. 2-4.)

Mindful that pro se filings in the First Circuit are held
to "a less stringent procedural standard than others," Nunnally
v. MacCausland, 996 F.2d 1, 6 n.8 (1st Cir. 1993) (citation
omitted), the court has incorporated documentation submitted
but not cited by Plaintiff. But see F.D.I.C. v. Anchor Props.,
13 F.3d 27, 31 (1st Cir. 1994) (finding civil litigant's pro
se status did not absolve him of obligation to comply with
district court's procedural rules).

[2] Under its "courtesy rule," the Federal Circuit is
"generally guided by the law of the regional circuit to which
district court appeals normally lie, unless the issue pertains
to or is unique to patent law." Amana Refrigeration, Inc. v.
Quadlux, Inc., 172 F.3d 852, 856 (Fed. Cir. 1999) (internal
quotation marks and citations omitted).

3

Plaintiff owns U.S. Patent No. 5,913,685 (filed June 24, 1996) (issued June 22, 1999) ("the '685 patent"), which discloses an electronic device "to provide guidance to rescue personnel trained in CPR for resuscitating a victim under an emergency condition." '685 patent, col.9 ll.46-48. Each claim of the '685 patent requires a "general purpose computer," see, e.g., id. at col.10 l.40, and an "interactive display input," see, e.g., id. at col.10 l.49. Since CPR procedures can differ depending upon the condition or traits of the victim, the purpose of the latter feature is to permit a user to enter into the device the "characteristics of said victim relevant to proper performance of CPR." Id. at col.9 ll.52-57.

Plaintiff also holds two copyright registrations relevant to this litigation. U.S. Copyright No. TX-u-210-208 is entitled "Script & Word List" and was registered by Plaintiff on September 13, 1985. It consists of a series of different digitized words, or "scripts," based on factors such as the characteristics of the victim and the number of on-site rescue personnel. (Dkt. No. 21, Def.'s Statement Undisputed Facts ¶ 18 (citing Dkt. No. 23, Freeman Decl., Ex. C); Pl.'s Mem. Controverting Def.'s Statement Undisputed Facts ¶ 18 (confirming accuracy of Defendant's ¶ 18

assertions).)[3]

U.S. Copyright No. TX-u-213-859 is entitled "LC5800 series cross assembler" and was registered by Plaintiff on October 8, 1985.  It applies to a computer program designed to guide individuals through CPR by illustrating the proper timing and quantity of compressions.  (Dkt. No. 26, Pl.'s Opp'n Def.'s Mot. Summ. J. 8.)  Both copyrights are found in a device called "CPR Prompt®" -- the commercial embodiment of U.S. Patent No. 4,584,524 (filed Nov. 21, 1984), which the Patent and Trademark Office ("PTO") issued to Plaintiff on April 22, 1986.  (Id. at 7.)

B.    The Accused Device.

Defendant's AED Plus is a portable automatic external defibrillator that guides a rescuer through a resuscitation sequence that may include defibrillation and/or CPR.  The defibrillator monitors the rhythm of a victim's heart and determines whether an electric shock is necessary to return the heart to its normal rhythm.  (Freeman Decl. ¶ 4.)  If a shock is required, the AED Plus charges the defibrillator and audibly instructs the rescuer to administer the shock by

---

[3] Plaintiff disputes thirteen of Defendant's thirty-one statements of purportedly undisputed facts and maintains that "[m]any others . . . can only be accepted with clarification." (Pl.'s Opp'n Def.'s Mot. Summ. J. 3.)  The only facts furnished by Defendant found in this summary are those that Plaintiff has not disputed.

pressing a button.   (<u>Id.</u> at ¶ 5.)

After a shock has been delivered, the device continues to monitor the victim's heart and indicates whether additional defibrillation and/or CPR should be performed. (<u>Id.</u>)   If the victim requires CPR, the AED Plus analyzes the depth and frequency of chest compressions and provides an audible beep to assist rescuers in performing compressions at the prescribed rate.   (<u>Id.</u> at ¶ 4.)

Defendant's device retains certain data associated with a rescue, such as when defibrillation shocks were delivered. This data is automatically deleted the next time the AED Plus is used, unless it has been transferred to a personal computer or personal digit assistant ("PDA") running a special program called RescueNet.   (<u>Id.</u> at ¶ 6.)

C.   <u>Communications between the Parties</u>.

On April 16, 2003, after reading a magazine article that described the accused device, Plaintiff wrote a letter to Richard Packer, the President of Zoll.   (<u>See</u> Dkt. No. 1, Ex. F, Letter from Donald C. Hutchins to Richard Packer (April 16, 2003).)   Noting that the "AED Plus carries many of the features found in the Claims of [the '685 patent]," Plaintiff suggested that the parties "discuss the possibilities of Zoll licensing this Patent for use with AED's."   (<u>Id.</u>)

6

Packer responded to Plaintiff's letter by telephone on May 5, 2003 and explained Defendant's position that its device did not infringe the '685 patent because it used a dedicated microprocessor rather than a general purpose computer. (Dkt. No. 1, Ex. N, June 21, 2004 Hutchins Aff. ¶ 13.) Plaintiff replied that "it was commonly known that a microprocessor is a computer on a chip." (Id.)

On August 11, 2003, Gary Freeman, Defendant's Vice President of Clinic Affairs, sent Plaintiff an e-mail asking if he would be interested in "further discussions regarding licensing of [Plaintiff's] CPR Prompt patents." (Dkt. No. 15, Ex. F, E-mail from Gary Freeman to Donald C. Hutchins (Aug. 11, 2003).) In a letter dated that same day, Plaintiff expressed his willingness to discuss "the licensing of [the '685 patent] for use with ZOLL's AED Plus," but suggested expanding the discussion to permit Plaintiff to explain how the '685 patent could "furnish both hardware and software-code protection to ZOLL for automatic methods of capturing [rescue data]." (Dkt. No. 1, Ex. I, Letter from Donald C. Hutchins to Gary Freeman (Aug. 11, 2003).)

During an August 20, 2003 meeting at Defendant's headquarters, the parties learned that Defendant's patent counsel was a partner at the same firm as Plaintiff's patent

7

counsel.  According to Plaintiff, he agreed to enter a
Consent Agreement to allow Defendant's counsel to review his
patents "based on the wording of the Consent Agreement that
specified that the purpose of the review was Zoll's desire
to license the '685 patent."  (Pl.'s Mem. Controverting
Def.'s Statement Undisputed Facts ¶ 28.)

In September 2003, the parties executed a Consent
Agreement that began by expressing the parties' interest
"in exploring the possibility of an agreement in which
[Defendant] would acquire rights under one or more patents
or patent applications owned by [Plaintiff]."  (Dkt. No. 1,
Ex. K, Agreement.)  In signing the agreement, Plaintiff
acknowledged that "the evaluation and advice provided to
ZOLL may possibly be directly contrary to his interests."
(Id.)

On September 24, 2003, Freeman sent Plaintiff an e-mail
indicating that its patent counsel was set to commence an
evaluation of Plaintiff's patents, which Freeman estimated
would "take as long as a month or so."  (Dkt. No. 1, Ex. L.,
E-mail from Gary Freeman to Donald C. Hutchins (Sept. 24,
2003).)  "At that point," Freeman wrote, "we can discuss in
detail all the patent and business issues."  (Id.)

According to Plaintiff, "Freeman never communicated
results of the evaluation by [Defendant's patent counsel] as

8

he had agreed to do."   (Pl.'s Mem. Controverting Def.'s Statement Undisputed Facts ¶ 30.)

D.   <u>The Travel of the Case</u>.

On June 22, 2004, Plaintiff filed a six-count complaint alleging "Copyright Infringement" (Count I), "Breach of Contract" (Count II), "Patent Infringement by Means of Sales" (Count III), "Patent Infringement by Means of Manufacture" (Count IV), "Patent Infringement by Means of Computer Program" (Count V), and "Patent Infringement by Means of Computer Network, Output, Transmission, Record Keeping, and Storage" (Count VI).

After Defendant tendered an answer, the parties submitted claims construction memoranda.  Rather than propose a formal construction of any claim term in the '685 patent, Plaintiff chose to provide a narrative of how he came to procure this patent and its predecessors.  <u>See generally</u> Dkt. No. 8, Pl.'s Claim Construction Mem.)  In contrast, Defendant proposed definitions for each term it saw as a potential source of dispute.

The first claim element for which Defendant offered a definition was "general purpose computer."  As previously mentioned, this term is present in each claim of the '685 patent.  According to Defendant, "a general purpose computer"

means a computer capable of running multiple
unrelated programs, which are selected by the user
and loaded into the device. It must feature at
least: (1) a central processing unit, (2) one or
more input devices that are not specific to any one
program, (3) memory, (4) mass storage devices (such
as a disk drive) for storing large amounts of data,
and (5) one or more output devices.

(Dkt. No. 10, Def.'s Claims Construction Chart 1.)

The second term at issue for which Defendant offered a

definition is "interactive display input." Defendant

proposed that this term means

a device for communicating with a computer which
allows a user to respond to options presented by
the computer by selecting from a menu displayed on
a display screen.

(Id. at 2-3.)

Finally, Defendant submitted that the phrase

"characteristics of said victim relevant to proper

performance of CPR techniques" means

the following specific traits or qualities of the
victim: (1) whether the victim is an adult, baby,
or child; (2) whether the victim requires
mouth-to-mouth resuscitation; and (3) whether a
choking victim is conscious or unconscious.

In an effort to "simplify areas of disagreement,"

Plaintiff filed an affidavit on March 25, 2005, in which he

stated:

I can agree with the definitions held by
[Defendant] in [Defendant's] claim construction and
appendix . . . . I believe that [Defendant's] claim
construction and definitions support my Complaint
of patent infringement . . . .

10

(Dkt. No. 12, Ex. A, Hutchins Aff. ¶¶ 6-7, Mar. 25, 2005;
see also Dkt. No. 43, Pl.'s Clarification Brief 2 ("Hutchins
can agree and litigate to the dictionary terms presented in
Zoll's claim construction as filed."); Dkt. No. 53, Pl.'s
Brief Controverting Def.'s Feb. 22, 2006 Arguments 2
(Defendant's definition of "[general purpose computer] fits
Hutchins concept of a general-purpose computer.").)

### III. CROSS MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper if there is no genuine issue
as to any material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In
cases where both parties have moved for summary judgment,
the basic summary judgment framework remains intact. De
Jesus-Rentas v. Baxter Pharm. Servs. Corp., 400 F.3d 72, 74
(1st Cir. 2005) (citation omitted).  "The court must rule on
each party's motion on an individual and separate basis,
determining, for each side, whether a judgment may be
entered in accordance with the Rule 56 standard."
Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st
Cir. 2002) (citation omitted).

While the court must alternately draw all reasonable
inferences in each nonmovant's favor, each nonmovant "must
respond to a properly supported motion with sufficient
evidence to allow a reasonable jury to find in its favor

'with respect to each issue on which [it] has the burden of proof.'" Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc., 405 F.3d 36, 39 (1st Cir. 2005) (citing DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)); see also Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002) (an alleged factual dispute must be capable of affecting the suit's outcome to withstand an otherwise properly supported motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

A.    Defendant's Motion for Summary Judgment.

    1.    Count I: Copyright Infringement.

    Proof of copyright infringement requires a plaintiff to show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)).[4]  In this case, Defendant concedes Plaintiff's

---

    [4] While the Federal Circuit "has jurisdiction over . . . claims for patent, as well as copyright, infringement," it "applies copyright law as interpreted by the regional circuits, in this case . . . for the [First] Circuit." Amini Innovation Corp. v. Anthony Cal., Inc., 439 F.3d 1365, 1368 (Fed. Cir. 2006) (citing 28 U.S.C. §§ 1292, 1295, 1338 (2005); Atari Games v. Nintendo of Am., 897 F.2d 1572, 1575 (Fed. Cir. 1990)).

ownership of valid copyrights.  The question thus becomes
whether Plaintiff can prove that Defendant copied original
aspects of his work.

To prove illicit copying a plaintiff must first
demonstrate that copying, "as a factual matter," actually
took place. <u>Lotus Dev. Corp. v. Borland Int'l, Inc.</u>, 49
F.3d 807, 813 (1st Cir. 1995), <u>aff'd</u>, 516 U.S. 233 (1996),
<u>rehr'g denied</u>, 516 U.S. 1167 (1996).  Since "[p]lagiarists
rarely work in the open," <u>Johnson</u>, 409 F.3d at 18, a court
may infer that there was "factual copying" if "the alleged
infringer had access to the copyrighted work" and there is
"probative similarity" between "the offending and
copyrighted works," <u>Lotus Dev.</u>, 49 F.3d at 813 (citations
omitted).  "[T]wo works are probatively similar if . . . any
similarities . . . , in the normal course of events, would
not be expected to arise independently . . . ." <u>Positive
Black Talk Inc. v. Cash Money Records, Inc.</u>, 394 F.3d 357,
370 (5th Cir. 2004) (citation omitted).

Once a plaintiff shows probative similarity, he must
then establish that "the copying of the copyrighted material
was so extensive that it rendered the infringing and
copyrighted works 'substantially similar.'" <u>Segrets, Inc.
v. Gillman Knitwear Co., Inc.</u>, 207 F.3d 56, 60 (1st Cir.
2000) (citation omitted), <u>cert. denied</u>, 531 U.S. 827 (2000);

13

see also Johnson, 409 F.3d at 18 (finding substantial
similarity in cases where an "ordinary observer" would
conclude that the defendant "unlawfully appropriated the
plaintiff's protectable expression" (citations omitted)).

In assessing an allegation of factual copying, a court
must dissect the copyrighted work "by separating its
original, protected expressive elements from those aspects
that are not copyrightable because they represent
unprotected ideas or unoriginal expressions." Johnson, 409
F.3d at 19.  Examples of unprotected ideas or unoriginal
expressions include "fragmentary words and phrases" and
"forms of expression dictated solely at functional
considerations." CMM Cable Rep, Inc. v. Ocean Coast Props.,
Inc., 97 F.3d 1504, 1519 (1st Cir. 1996) (citations
omitted); see also id. at 1520 (stating that such materials
fail to evince the requisite quantum of creativity).

In addition, under the doctrine of merger, copyright
protection is unwarranted "[w]hen there is essentially only
one way to express an idea." Yankee Candle Co., Inc. v.
Bridgewater Candle Co., LLC, 259 F.3d 25, 36 (1st Cir. 2001)
(citation omitted).  In such cases, "the idea and its
expression are inseparable and copyright is no bar to
copying that expression." Id. (noting that where the merger
doctrine applies, plaintiffs bear "the heavy burden" of

14

establishing "near identity" of the works at issue).

In this case, Plaintiff bases his first copyright infringement claim on Defendant's use of "27 phrases" allegedly found in his "Script & Word List." Significantly, Plaintiff has not specified a single offending phrase, and a comparison of the voice prompts in question indicates that only two are identical -- "Check breathing" and "Call for help" -- and only three are remotely similar -- "Stay Calm" ("Remain Calm"), "If no pulse, start CPR" ("If no pulse, continue"), and "Give two breathes" ("Start With Two Breaths"). (Compare Dkt. No. 23, Ex. C., AED Plus Administrator's Guide 15-16, with Dkt. No. 23, Ex. D, Copyright No. Txu-210-208, "Script & Word List".)

Assuming arguendo that these five phrases could render the works probatively similar, such "copying" does not constitute copyright infringement. As the Johnson court made clear, "copyright law protects original expressions of ideas but it does not safeguard either the ideas themselves or banal expressions of them." 409 F.3d at 19 (citing Feist, 499 U.S. at 345-51) (emphasis added). Here, the information contained in Plaintiff's five short phrases is entirely functional. Indeed, the Script & Word List phrases contain "no stylistic flourishes or any other forms of creative expression that somehow transcend the functional

15

core of the directions." <u>Nat'l Nonwovens, Inc. v. Consumer</u>
<u>Prods. Enters., Inc.</u>, 397 F. Supp. 2d 245, 256 (D. Mass.
2005) (citation omitted).

Furthermore, because Plaintiff's phrases communicate
ideas that require, "if not only one form of expression, at
best only a limited number . . . the subject matter would be
appropriated by permitting the copyrighting of [their]
expression." <u>John G. Danielson, Inc. v. Winchester-Conan</u>t
<u>Props.</u>, 322 F.3d 26, 43 (1st Cir. 2003) (quoting <u>Morrissey</u>
<u>v. Procter & Gamble Co.</u>, 379 F.2d 675, 678-79 (1st Cir.
1967)).  Rather than allow copyright law to become "a game
of chess in which the public can be checkmated," <u>id.</u>, the
court must conclude that the doctrine of merger forecloses
Plaintiff's first infringement allegation.

In support of his second copyright infringement claim,
Plaintiff asserts that "the CPR section structure of the
computer program that controls the AED Plus compares exactly
with the timing and quantity of compressions used in the
Copyright No. Txu-213-859 program."  (Pl.'s Opp'n Def.'s
Mot. Summ. J. 8.; <u>see also</u> Pl.'s Mem. Controverting Def.'s
Undisputed Facts ¶¶ 22, 23 (noting that "both the LC5800
[series cross assembler] and AED Plus require[] a program to
produce 100 compressions per minute and to output this sound
as an audible sound to the rescuer").)

16

This argument suffers from the simple fact that the basic protocol for CPR, including the timing and quantity of compressions, was developed by the American Heart Association long before Plaintiff entered the field of CPR prompting. (See Dkt. No. 36, Pl.'s Mem. Controverting Def.'s Reply Supp. Mot. Summ. J. 8 (acknowledging that the algorithms of the LC5800 cross series assembler "are designed to produce the standard for repetitive phrases, timing and rate <u>as taught by the American Heart Association</u>.") (emphasis added); Pl.'s Mem. Controverting Def.'s Undisputed Facts ¶ 20 ("Hutchins agrees that CPR was developed in 1960 and the basic protocol for CPR has not changed since 1960.").) Plaintiff's subsequent incorporation of this protocol in his device does not entitle him to prevent others from doing the same. <u>See Grubb v. KMS Patriots, L.P.</u>, 88 F.3d 1, 6 (1st Cir. 1996) ("[T]wo works may be identical in every detail, but, if . . . both works were copied from a common source in the public domain, then there is no infringement." (citation omitted)).

Moreover, even if Plaintiff had invented CPR, the Copyright Act clearly does not afford protection for processes or procedures. 17 U.S.C. § 102(b) (2006). In short, Plaintiff's software copyright claim is based upon

17

uncopyrightable subject matter.

    2.  <u>Count II: Breach of Contract</u>.

    In his complaint, Plaintiff alleges that Defendant breached a "verbal contract to negotiate in good faith" as well as a "written contract . . . to expedite a final license." (Dkt. No. 1, Compl. ¶ 38.) At other points of this litigation, Plaintiff has also suggested that Defendant violated a contractual obligation by failing to communicate the results of its patent counsel's work. <u>See</u> Pl.'s Mem. Controverting Def.'s Undisputed Facts ¶ 30.) Construing Plaintiff's pleadings liberally, the court will address each of these theories in turn.

    First, Plaintiff submits that the parties' e-mail exchanges, phone calls, meeting, and Consent Agreement would be "understood by business persons to be a contract between the parties to negotiate in good faith." Unfortunately for Plaintiff, the law is well-settled that the essential terms of a contract must be definite enough to ascertain the nature and extent of the parties' obligations. <u>Mass Cash Register, Inc. v. Comtrex Sys. Corp.</u>, 901 F. Supp. 404, 417 (D. Mass. 1995) (citing <u>Simons v. Am. Dry Ginger Ale Co.</u>, 335 Mass. 521, 523 (1957)). Having failed to identify the terms of this alleged contract, Plaintiff cannot rely on the court to fill in the blanks. While an obligation of "good

18

faith and fair dealing is implicit in the performance of a contract, even if not stated," this "principle presupposes the formation of a contract" and is therefore inapplicable during "the courtship dance phase of contract formation." Schwanbeck v. Fed.-Mogul Corp., 31 Mass. App. Ct. 390, 396 n.6 (1991) (citations omitted), overruled on other grounds by 412 Mass. 703 (1992); see also Bell v. B. F. Goodrich Co., 359 Mass. 763, 763 (1971) (finding oral agreement to negotiate does not create binding contract)).

Plaintiff's next contention that Defendant breached a written contract to expedite a final license agreement is at odds with the plain language of the Consent Agreement, the parties' only written agreement.  Simply put, nothing in this document compels either party to work towards or enter into a license agreement.  Instead, the Consent Agreement merely indicates a mutual interest "in exploring the possibility of a[] [license] agreement."

Finally, there is Freeman's unfulfilled promise in a September 24, 2003 e-mail to contact Plaintiff once Defendant's patent counsel completed his analysis of Plaintiff's patent.  The suggestion that the court should regard the performance of this promise as a duty founders upon the well-established principle that, absent circumstances inapplicable here, enforceable contracts

19

require consideration. <u>Neuhoff v. Marvin Lumber & Cedar
Co.</u>, 370 F.3d 197, 201 (1st Cir. 2004) (applying
Massachusetts law). In other words, "the contract must be a
bargained-for exchange in which there is a legal detriment
of the promisee or a corresponding benefit to the promisor."
<u>Id.</u> (citation omitted).

In this case, it is clear that Plaintiff neither
provided anything, nor refrained from doing anything, in
exchange for the Defendant's pledge to keep him "up to date"
with the work of its patent attorney. While Defendant
could, and perhaps should, have informed Plaintiff when it
decided not to license his patent, it is also clear that
Defendant would not have received a corresponding benefit if
it had done so. In short, because Freeman's promise was
gratuitous, the alleged contract "committing Zoll to
continued discussions" is unenforceable for lack of
consideration. <u>See</u> <u>Congregation Kadimah Toras-Moshe v.
DeLeo</u>, 405 Mass. 365, 366 (1989).

   3.   <u>Counts III-VI: Patent Infringement</u>.

To determine whether a patent has been infringed, a
court must first interpret the patent's claims to ascertain
their scope and meaning, then compare the properly construed
claims to the accused device. <u>Nazomi Commc'ns, Inc. v. Arm
Holdings, PLC</u>, 403 F.3d 1364, 1367-68 (Fed. Cir. 2005)